[No. D055431. Fourth Dist., Div. One. Mar. 24, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
NATHANIEL MARCUS GANN et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.B., C., D., and E., and IV.

## Counsel

Doris M. Frizzell, under appointment by the Court of Appeal, for Defendant and Appellant Nathaniel Marcus Gann.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant Brae F. Hansen.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Jeffrey J. Koch and Christopher Pratt Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**AARON, J.—**

### I.

### INTRODUCTION

In a joint trial with separate juries, brother and sister Nathaniel Marcus Gann and Brae F. Hansen were convicted of first degree murder in the shooting death of their stepfather. Gann's jury did not sustain a special circumstance allegation that he committed the murder by means of lying in wait within the meaning of Penal Code[1] section 190.2, subdivision (a)(15). Hansen's jury, however, made a true finding as to the lying-in-wait special circumstance. The trial court sentenced Gann to 25 years to life, and sentenced Hansen to life in prison without the possibility of parole.

In his appeal, Gann claims that the trial court erred in allowing his jury to hear evidence of statements that Hansen made to a 911 operator and to police officers prior to her arrest, and in admitting the rebuttal testimony of a former girlfriend of Gann's who claimed that Gann had raped her when they were in high school. Gann argues that the cumulative prejudicial effect of these two evidentiary errors requires reversal. In addition, Gann claims that the trial court erroneously instructed his jury concerning Hansen's prearrest statements. Gann further contends that the trial court was biased against defendants. Finally, Gann requests that this court review sealed psychiatric records of a prosecution witness to determine whether the trial court abused its discretion in refusing to release the records to Gann's counsel.

In her appeal, Hansen contends that the trial court erred by admitting her postarrest confession because, she claims, she confessed only after police promised her leniency, thereby rendering the confession involuntary. Hansen also contends that the trial court erred in allowing her jury to hear portions of Gann's defense case. Hansen further asserts that because she is ineligible for parole, it was error for the court to impose a parole revocation fine.[2]

---

[1] Statutory references are to the Penal Code unless otherwise specified.

[2] Gann and Hansen join in each other's arguments to the extent that he or she would benefit thereby. (Cal. Rules of Court, rule 8.200(a)(5).)

II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Factual background*

In July 2007, Hansen, who was then 17 years old, lived with her stepfather, Timothy MacNeil (MacNeil), on Marraco Drive in the Rolando area of San Diego. Gann lived in Arizona and attended college there. Gann and Hansen's mother, to whom MacNeil had been married, had committed suicide the previous year. MacNeil had begun dating a woman a few months after the suicide. By July 2007, he was spending most of his time with this woman. Hansen thought that MacNeil was ignoring her, and she began to feel unloved and worthless. MacNeil had recently told Hansen that she needed to prepare to move out when she turned 18. These developments angered Hansen.

#### 1.  *Events leading up to the crime*

Hansen phoned her brother and they discussed killing MacNeil. They agreed on a plan to hire a hit man to kill MacNeil on MacNeil's birthday, July 18. Hansen would take MacNeil out for a birthday lunch, and the hit man would stage either a burglary or a home invasion robbery and kill MacNeil when MacNeil and Hansen returned to MacNeil's residence after lunch.

Hansen withdrew money from two bank accounts to pay the hit man. She also retrieved a gun that had belonged to her late mother, and made a duplicate house key. Hansen put the cash, gun and key in a box and placed the box on the back porch for the hit man.

The initial plan had to be changed because Gann was unable to hire a hit man, and MacNeil decided to celebrate his birthday with his girlfriend rather than with Hansen. Hansen arranged to take MacNeil to lunch for his birthday on July 19—the day after MacNeil's birthday. After the hit man plan fell through, Gann decided to kill MacNeil himself. He purchased black clothing from a Goodwill store in Arizona and drove to San Diego. Gann parked his truck on a street that was uphill from MacNeil's residence.[3]

According to Hansen's confession, Gann arrived at MacNeil's residence at 4:30 a.m. on July 19 and entered the house, using the key that Hansen had

---

[3] The two-level house on Marraco Drive in which MacNeil and Hansen lived was built on a hill. The upper level was accessible from the street. The lower level was accessible from both a staircase inside the house and a driveway that ran down the left side of the property. From the backyard, a footpath led down to a lower street. Throughout the hilly neighborhood, stairway easements provided homeowners access to higher and lower streets.

left on the porch. Once Gann was in the house, he awakened Hansen and told her that they were going to proceed with their modified plan regardless of whether she wanted to or not. During her postarrest interview with police, Hansen claimed that after Gann was unable to procure a hit man, she decided that she did not want to go through with the murder plot.[4]

### 2.  *The murder of Timothy MacNeil*

MacNeil, who had spent the previous night at his girlfriend's residence and then attended morning appointments, arrived at his residence at 12:15 p.m. on July 19 to pick up Hansen for their lunch. When MacNeil arrived at the residence, he called out his arrival to Hansen, who responded that she was in the bathroom. As was his habit, MacNeil went downstairs to check telephone messages in his home office. Before he reached his office, MacNeil was confronted in the downstairs game room by Gann, who was dressed completely in black and wearing a mask that had only eye slits. Within minutes, Hansen walked downstairs, where she saw Gann pointing a gun at MacNeil. The disguised Gann ordered her at gunpoint to tie MacNeil's hands with zip ties. After Hansen complied, Gann tied her hands behind her back with zip ties.

At one point, MacNeil asked to use the bathroom. Gann cut Hansen's zip ties and told her to pull down MacNeil's pants. After Hansen complied, Gann retied Hansen's hands with zip ties, took her to the laundry room area where he placed her facing the wall, and told her not to turn around. Hansen heard a struggle followed by a gunshot. The bullet entered the right side of MacNeil's body, just above the hip bone, causing him to fall down. The first gunshot was followed by three more: a shot that hit MacNeil in the face; a shot that grazed MacNeil's scalp, entered his shoulder and lodged just above the elbow; and a shot to the back of MacNeil's head, which killed him instantly.

According to Goodman's testimony, Gann related that Hansen had contacted him after MacNeil told her that she would have to move out of his house when she turned 18. Gann and Hansen decided to "take care of" MacNeil. They initially planned to hire a hit man to kill their stepfather, but the hit man whom Gann contacted failed to show up. Goodman also testified that Gann purchased black clothing at a Goodwill store before driving to San

---

[4] The Gann jury did not hear evidence of Hansen's confession. However, both juries heard testimony from Charles Goodman, who was Gann's cellmate while both were housed in the psychiatric ward of an Arizona jail. Goodman related what Gann had told him about the crime. Goodman's testimony as to what Gann had told him about the crime was similar in many respects to the account that Hansen gave in her confession. (Although the court had ruled that the Hansen jury was to be excused during Goodman's testimony, Hansen's counsel chose to have her jury hear Goodman's testimony, for tactical reasons.)

Diego. When Gann arrived at MacNeil's house, Hansen was there, and they discussed their plans. When MacNeil arrived home, Gann put on a makeshift mask and "acted like it was a robbery." Gann directed Hansen to tie up MacNeil; Gann then tied up Hansen. However, MacNeil was not tied up well and he managed to get free. When Gann went to tie MacNeil again, the gun accidentally fired, and the bullet hit MacNeil. MacNeil said, "Why are you killing me, Nathan?" and "Why are you doing this to me, Nathan?" Gann then began to shoot at MacNeil. After shooting MacNeil in the head, Gann fled the scene. Gann discarded the gun and the black clothing after he left the house, and drove back to Arizona.

Several neighbors told police that they saw a young man running away from the MacNeil house. A witness saw the young man run to a truck that was later identified as Gann's, and drive away. Another witness testified that he was 90 percent sure that it was Gann whom he had seen fleeing.

After Gann left, Hansen, who was still bound, called 911 to report a home invasion robbery and the shooting of her stepfather. Hansen told the 911 operator that she and MacNeil had entered the house together and said that they had been confronted downstairs by an armed masked man who was dressed entirely in black. Hansen said that the robber had taken her watch and a ring.[5] Hansen told the operator that the robber had demanded the combination to the house safe, and that MacNeil had refused to reveal it. At that point, the robber shot MacNeil, killing him. Hansen made the 911 call at 12:30 p.m.

When police arrived, they found MacNeil lying facedown on the floor in a pool of blood. He was naked from the waist down.[6] Hansen was cowering in a corner on the other side of a pool table. Hansen's hands were bound behind her with a plastic zip tie. Hansen was crying and complained that her wrists hurt because the zip tie was too tight. Officer Colin Forsey took Hansen outside and removed the zip tie.

Police found no signs of forced entry. On the back porch, police discovered a .347-caliber revolver at the top of the stairs that led to the backyard. Police later found a black shirt in a five-foot-tall tree along the masked man's escape route.[7]

---

[5] Police later learned that before MacNeil and Hansen arrived at the house, Hansen had taken off her watch and ring and had hidden them in her bedroom, as part of the plan to make it appear that she was a victim of the home invasion robbery.

[6] Police found MacNeil's pants and boxer shorts in the bathroom.

[7] At the time police found the black shirt, they did not realize that there was a dark blue ski mask or hat with cut eye slits inside the black shirt. The mask was not discovered until the shirt was examined in the crime lab. The mask was covered with debris inside and out, but the

While Hansen was sitting in an ambulance at the scene, she told Officer Forsey that a masked man had surprised MacNeil in the downstairs game room and bound his hands. The masked man also bound her hands and took her ring and cell phone from her. The man then placed her in another room, returned to MacNeil in the game room, and demanded the combination to the safe. MacNeil refused to give the man the combination, and a struggle ensued. The struggled ended with gunshots.

Detective Maria Rivera drove Hansen to the police station, where she interviewed the 17 year old who, at the time, police considered to be a victim. Hansen told Rivera that she returned to the Marraco Drive residence after taking an hour-long walk and went into the upstairs bathroom. Two minutes later, MacNeil arrived. Assuming that MacNeil had gone downstairs, Hansen did so as well. When Hansen got downstairs, she saw a masked man, dressed entirely in black, pointing a gun at MacNeil, whose hands were tied behind him with zip ties. MacNeil said that he had to go to the bathroom, and the man pointed the gun at Hansen and told her to take off MacNeil's pants. The masked man then zip tied Hansen's hands and took her ring, watch and cell phone. He pushed Hansen against the wall near the laundry room. Hansen heard the man ask MacNeil for the combination to the safe, which MacNeil refused to give. Hansen heard a struggle and a gunshot. The man fired at least two more shots at MacNeil before running out the back door.

After the interview, Rivera drove Hansen to the residence of Hansen's uncle and aunt, Richard and Bonnie MacNeil. Rivera returned to Richard MacNeil's residence that evening and talked with Hansen again. This time, Hansen's rendition of the events included a significant deviation from her earlier accounts. Referring to the masked intruder, she said, "Nathan tied my hands." At that point, Rivera wrote "Nathan" in her notebook. Later, Rivera asked Hansen about her reference to the intruder as "Nathan." Hansen initially denied having said "Nathan." When Rivera pressed her on the issue, Hansen said that she remembered that MacNeil had addressed the intruder as "Nathan." After Hansen mentioned the name "Nathan," Rivera retrieved a tape recorder and recorded the rest of her conversation with Hansen. Rivera learned from Bonnie MacNeil that Hansen's older brother's name is Nathaniel.

Hansen told Richard and Bonnie MacNeil's daughter (the daughter) that a composite sketch of the intruder, which had been distributed by the media, was inaccurate. The daughter became suspicious because Hansen had previously maintained that she had not seen the intruder's face. On her own, the

shirt was not. No DNA was recovered from the shirt. The first sample taken from the mask did not have sufficient DNA for analysis. Subsequently, more samples were taken, and it was determined that DNA from the mask matched Gann's DNA profile.

daughter telephoned the police and reported the discrepancy. After receiving this information from the daughter, police returned to Richard MacNeil's residence and arrested Hansen at 10:45 p.m.

At the police station, Hansen confessed that she and Gann had planned to kill MacNeil and to make it look like he had been killed during a home invasion robbery. Gann was arrested early the following morning in Arizona.

Hansen rested without presenting evidence.

In Gann's defense case, he presented evidence that gloves used by MacNeil's assailant were never found, and that Gann's fingerprints were not found on the gun. A police detective demonstrated how a right-handed person typically would lay down the murder weapon. Another detective identified a photograph of Gann's truck. A defense investigator demonstrated that with a zip tie binding her hands behind her back, she could easily make the binding tighter by herself. Both juries heard this evidence.

Hansen's jury was not present for the testimony of the remainder of Gann's witnesses. These included seven character witnesses who testified that Gann was a nonviolent person, that he had no animosity toward MacNeil, and that he had been physically abused by his mother. Gann also presented witnesses who testified that Hansen was frustrated by MacNeil, resented MacNeil's girlfriend, and had once considered poisoning her own mother.

In rebuttal, the prosecution presented the testimony of Gann's former girlfriend. In surrebuttal, Gann presented four witnesses to impeach the former girlfriend.

The parties stipulated that, among other things, the gun that killed MacNeil was once owned by Gann and Hansen's mother, and that the gun belonged to MacNeil at the time of his death. They also stipulated that Gann is left handed and that Hansen is right handed.

B.   *Procedural background*

On January 18, 2008, the district attorney filed an information that charged Gann and Hansen with first degree murder and special circumstances.[8] Gann and Hansen both filed motions to sever their cases for trial. The severance

---

[8] The information alleged a special circumstance of lying in wait as to both Gann and Hansen. The information further alleged that Gann had personally used a firearm and proximately caused a death within the meaning of section 12022.53, subdivisions (d) and (e)(1). As to Hansen, the information alleged that she had been vicariously armed within the meaning of section 12022, subdivision (a)(1).

motions were rendered moot on October 9, 2008, when the district attorney announced its intention to try defendants separately. Also on that day, the court granted Hansen's pending motion for a continuance. This set the stage for Gann's first trial.

On November 5, 2008, jury selection in Gann's first trial began. After seven days of testimony, the jury began deliberating on November 18. On November 20, the jury announced that it was hopelessly deadlocked, and the trial court declared a mistrial.

On December 23, the trial court granted the prosecution's motion for rejoinder, which both Gann and Hansen opposed. The court ruled that the joint case would be tried to two different juries.

On March 16, 2009, jury selection for Hansen's jury began. The following day, a jury was selected and sworn to try the case.

On March 18, a jury was empaneled for Gann's trial. Trial commenced on March 23.

On April 15, Gann's jury convicted him of first degree murder. The jury also found that the lying-in-wait special-circumstance allegation and the personal use of a firearm allegation were not true.

On April 16, Hansen's jury convicted her of first degree murder and found that she had been vicariously armed. Hansen's jury also found true the lying-in-wait special circumstance.

On June 19, the trial court denied Gann's motion for a new trial and sentenced him to 25 years to life in prison. That same day, the trial court denied Hansen's motion for a new trial and sentenced her to life in prison without the possibility of parole. On its own motion, pursuant to section 1385, the court struck the allegation that Hansen had been vicariously armed.

Both Gann and Hansen filed timely notices of appeal.

III.

GANN'S APPEAL

A. *Admission of Hansen's prearrest statements in Gann's trial*

Gann contends that the trial court erred by allowing his jury to hear evidence of statements that Hansen made prior to her arrest, including the

911 call; the informal interview with Officer Forsey; and the two interviews with Detective Rivera. Specifically, Gann claims that Hansen's prearrest statements were not admissible under any hearsay exception, and that the admission of these statements denied him his Sixth Amendment right to confront a witness against him.

### 1. *Hearsay exception*

In her prearrest statements to the 911 operator and to police, Hansen claimed that a masked intruder had held her and MacNeil at gunpoint, and that the intruder had killed MacNeil after a struggle. The trial court found that Hansen's prearrest statements were admissible under the hearsay exception for statements of a coconspirator in furtherance of the conspiracy. (Evid. Code, § 1223.) The trial court's ruling was correct.[9]

Hearsay evidence is generally inadmissible. (Evid. Code, § 1200.) However, a hearsay statement is admissible against a party: "[I]f . . . [¶] (a) [t]he statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) [t]he statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) [t]he evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence." (Evid. Code, § 1223; see *People v. Hardy* (1992) 2 Cal.4th 86, 139 [5 Cal.Rptr.2d 796, 825 P.2d 781] (*Hardy*).)

A conspiracy is an agreement between two or more persons, with specific intent, to achieve an unlawful objective, coupled with an overt act by one of the conspirators to further the conspiracy. (*People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1402 [251 Cal.Rptr. 880].) The conspiracy itself need not be charged in order for Evidence Code section 1223's hearsay exception to apply to statements by coconspirators. (See *People v. Jourdain* (1980) 111 Cal.App.3d 396, 404 [168 Cal.Rptr. 702]; *People v. Wallace* (1970) 13 Cal.App.3d 608, 617–618 [91 Cal.Rptr. 643].) Further, only prima facie evidence of a conspiracy is required to permit the trial court to admit evidence under Evidence Code section 1223; the conspiracy may be shown by circumstantial evidence and the agreement may be inferred from the

---

[9] The trial court was correct in ruling that the scope of the conspiracy in this case included an agreement to make it appear that MacNeil was killed during a home invasion robbery. However, insofar as the trial court stated that the conspiracy did not end until defendants' arrests, that statement was incorrect. A conspiracy is usually deemed to have ended when the substantive crime that is the object of the conspiracy is either attained or defeated. (*People v. Leach* (1975) 15 Cal.3d 419, 431 [124 Cal.Rptr. 752, 541 P.2d 296] (*Leach*).)

conduct of the defendants mutually carrying out a common purpose in violation of a penal statute. (*People v. Herrera* (2000) 83 Cal.App.4th 46, 58–64 [98 Cal.Rptr.2d 911]; see also *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135 [36 Cal.Rptr.2d 235, 885 P.2d 1].)

■ While a conspiracy is usually deemed to have ended when the substantive crime for which the coconspirators are being tried is either attained or defeated (*Leach, supra*, 15 Cal.3d at p. 431), it is for the trial court to determine precisely when the conspiracy has ended (*id.* at p. 432). " 'A conspiracy is not necessarily a single event which unalterably takes place at a particular point in time when the participants reach a formal agreement; it may be flexible, occurring over a period of time and changing in response to changed circumstances.' [Citation.]" (*People v. Vargas* (2001) 91 Cal.App.4th 506, 553 [110 Cal.Rptr.2d 210].) Further, there may be "a situation where the conspiracy will be deemed to have extended beyond the substantive crime to activities contemplated and undertaken by the conspirators in pursuance of the objectives of the conspiracy." (*People v. Saling* (1972) 7 Cal.3d 844, 852 [103 Cal.Rptr. 698, 500 P.2d 610].)

Gann argues that Hansen's prearrest statements to the police do not qualify under Evidence Code section 1223 because they were made after MacNeil's murder, which, he claims, terminated the conspiracy. Gann maintains that since the conspiracy had ended, Hansen's prearrest statements could not have been made in furtherance of the conspiracy; rather, they were mere acts to avoid detection. However, the trial court found that the scope of Gann and Hansen's conspiracy included the murder of their stepfather, as well as making the murder appear to have taken place during a home invasion robbery.

"[W]hether statements made are in furtherance of a conspiracy depends on an analysis of the totality of the facts and circumstances in the case." (*Hardy, supra*, 2 Cal.4th at p. 146.) In *Hardy*, the main objective of the conspiracy was to acquire the life insurance benefits of the insured individuals, who were murdered in furtherance of the conspiracy. (*Id.* at p. 143.) Our Supreme Court held that the conspiracy did not end with the murders, but continued until the conspirators received the insurance proceeds, or until the policy beneficiary was convicted of unjustifiable homicide and rendered ineligible to collect. (*Id.* at p. 144.) The court concluded that coconspirator statements made during this lengthy period of the conspiracy were therefore admissible under Evidence Code section 1223. (*Hardy, supra*, at p. 144.)

■ The evidence supports the trial court's determination that the scope of the Gann-Hansen conspiracy encompassed both the murder of their stepfather and making it appear that the murder took place during a home invasion

robbery. Making it look like the murder occurred during a home invasion robbery was integral to the conspiracy. To this end, Gann and Hansen made it appear that Hansen was a victim of the staged home invasion by binding her hands with zip ties. In addition, Hansen hid her ring and watch beforehand so that she could claim that the intruder had taken them. After Gann left the residence, Hansen related to the 911 operator that a masked intruder had confronted her and MacNeil at gunpoint and had killed MacNeil. Hansen told both the 911 operator and Officer Forsey that the intruder, whom she said she did not know, and who she said had worn a mask and was dressed in black, had tied her hands with zip ties and taken her jewelry. Hansen recited essentially the same scenario to Detective Rivera. Hansen's 911 call and her prearrest statements to the police officers were integral to creating the false impression that MacNeil was killed during a home invasion robbery. The evidence thus fully supports the trial court's conclusion that the statements were made during and in furtherance of the conspiracy.

### 2. *Right to confront adverse witnesses*

In *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), the United States Supreme Court held that the confrontation clause of the Sixth Amendment to the United States Constitution prohibits the admission of out-of-court "[t]estimonal statements of witnesses absent from the trial [unless] the declarant is unavailable," and "only where the defendant has had a prior opportunity to cross-examine." (*Crawford, supra*, at p. 59.) The *Crawford* court did not set forth "a comprehensive definition" of what constitutes "testimonial evidence," but held that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Id.* at p. 68.) With respect to nontestimonial hearsay, *Crawford* held that where the proffered statement is not testimonial, state law may regulate the admission of evidence by applying statutory hearsay rules, without running afoul of the confrontation clause. (541 U.S. at p. 68.)

In *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*), the United States Supreme Court explained the distinction between nontestimonial and testimonial statements made to law enforcement officers during a 911 call or at a crime scene: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." (*Id.* at p. 822.) Statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Ibid.*)

■ In *People v. Cage* (2007) 40 Cal.4th 965 [56 Cal.Rptr.3d 789, 155 P.3d 205] (*Cage*), our Supreme Court identified several "basic principles" to assist courts in determining whether a particular statement is or is not testimonial. The court explained that although a testimonial statement need not be made under oath, it must have some "formality and solemnity characteristic of testimony" and "must have been given and taken primarily . . . to establish or prove some past fact for possible use in a criminal trial." (*Id.* at p. 984, italics omitted.) However, "statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*Ibid.*) "[T]he primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation." (*Ibid.*)

Using the analyses in *Davis, supra*, 547 U.S. 813 and *Cage, supra*, 40 Cal.4th 965, the Courts of Appeal in *People v. Brenn* (2007) 152 Cal.App.4th 166, 176 [60 Cal.Rptr.3d 830] (*Brenn*) and *People v. Banos* (2009) 178 Cal.App.4th 483, 492–493, 497 [100 Cal.Rptr.3d 476] (*Banos*) each found that the victims' respective statements to 911 operators were not testimonial. In *Brenn*, the court determined that the purpose and form of the statements used in the 911 call were "not the functional equivalents of trial testimony." (*Brenn, supra*, at p. 176.) In *Banos*, the court concluded that the statements were not testimonial because the primary purpose of the declarant was "to gain police protection." (*Banos, supra*, at p. 497.) The court noted, "The statements were not yet the product of an interrogation, rather they were made to police conducting an investigation into an ongoing emergency." (*Ibid.*)

■ As these cases make clear, a 911 call made during the course of an emergency situation is ordinarily made for the primary nontestimonial purpose of alerting the police about the situation and to provide information germane to dealing with the emergency. Applying the analysis of those cases here, we conclude that Hansen's statements to the 911 operator were not testimonial under *Crawford, supra*, 541 U.S. 36. The dispatcher was primarily concerned with what was happening at the moment in order to obtain information that would assist responding officers in rendering aid to the victims and finding the escaping perpetrator—not to secure a conviction in a court trial. The information given was not formal or structured. Because the statements that Hansen made to the 911 operator were not testimonial in nature, they were not subject to the requirements of *Crawford*.

The same analysis applies to the statements that Hansen made to Officer Forsey at the scene of the crime, shortly after her 911 call. Officer Forsey was

primarily concerned with determining what had happened and whether Hansen had any information that could help police find the man dressed in black, who officers believed might still be in the area. Officer Forsey's conversation with Hansen was not structured or formal. We conclude that Hansen's statements to Officer Forsey also were not testimonial. (*Banos, supra*, 178 Cal.App.4th at p. 497.)

However, the same analysis does not apply to statements that Hansen made to Detective Rivera prior to Hansen's arrest. Detective Rivera's interviews with Hansen were conducted under circumstances that were more formal than the circumstances surrounding the 911 call and the on-the-scene discussion with Officer Forsey. Rivera's first interview with Hansen took place at the police station and was recorded. At the time of this interview, police viewed Hansen as a victim and were attempting to obtain additional information to assist them in their investigation of MacNeil's murder. The second interview took place at Richard and Bonnie MacNeil's residence. While Rivera still viewed Hansen as a victim at the time she initiated her conversation with Hansen, after Hansen referred to the intruder as "Nathan," Rivera apparently became suspicious of Hansen, and decided to tape-record the rest of their discussion.

Because "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard" (*Crawford, supra*, 541 U.S. at p. 52), the statements that Hansen made to Detective Rivera at the police station and at Richard MacNeil's home are "testimonial" under *Crawford*.

However, when Hansen made the statements, she was engaging in conduct that was within the scope of the conspiracy, i.e., reinforcing the notion that MacNeil had been killed during a home invasion robbery committed by a masked intruder dressed in black. The statements at issue are thus coconspirator statements made during and in furtherance of the conspiracy. The question that we must decide is whether the admission in evidence of the statements that Hansen made to Detective Rivera violated Gann's Sixth Amendment confrontation rights.

The case of *U.S. v. Stewart* (2d Cir. 2006) 433 F.3d 273 (*Stewart*), in which the court addressed the admissibility of statements that were both in furtherance of a conspiracy and testimonial, is instructive. In *Stewart*, the federal government initiated insider trading investigations of suspicious sales of ImClone Systems, Inc., stock in December 2001. (*Id.* at p. 280.) Concluding that the two codefendants had misled investigators about their sales of large volumes of stock before the company announced that it had been denied approval for a key pharmaceutical product, the government indicted them for

conspiracy to obstruct justice, to make false statements, and to commit perjury. (*Id.* at pp. 280–281.) Following their convictions at a joint trial, each codefendant challenged the admission of the other's prior statements to FBI and SEC investigators. (*Id.* at p. 290.)

While acknowledging that the codefendants' statements, "having been made during interviews with government officials in the course of an investigation, do have characteristics of *Crawford's* 'core class of "testimonial" statements,' . . . in the context of the crimes for which [d]efendants were convicted," the *Stewart* court also noted that "the challenged statements are part and parcel of co-conspirators' statements made in the course of and in furtherance of [d]efendants' conspiratorial plan to *mislead* investigators." (*Stewart, supra*, 433 F.3d at p. 291, citations omitted, italics added.) Given that the conspiracy's primary objective was to obstruct the federal government's investigation, the *Stewart* court rejected the codefendants' claim that the admission of truthful portions of the otherwise testimonial hearsay violated their confrontation rights. (*Id.* at pp. 291–292.) The *Stewart* court reasoned that the "essence" of the conspiracy to obstruct justice charge "necessarily contemplate[d] that the conspirators would provide false information to government agencies during the course of their investigation and during interrogations that would produce testimonial statements of one or the other of them." (*Id.* at p. 292.)

The *Stewart* court noted that a conspiracy to obstruct justice necessarily involves the use of deception and misrepresentation because it seeks to hide the commission of an already completed substantive offense. (*Stewart, supra*, 433 F.3d at p. 292.) In this regard, the *Stewart* court stated, "It defies logic, human experience and even imagination to believe that a conspirator bent on impeding an investigation by providing false information to investigators would lace the totality of that presentation with falsehoods on every subject of inquiry. To do so would be to alert the investigators immediately that the conspirator is not to be believed, and the effort to obstruct would fail from the outset." (*Id.* at p. 292.)

The court continued, "The truthful portions of statements in furtherance of the conspiracy, albeit spoken in a testimonial setting, are intended to make the false portions believable and the obstruction effective. Thus, the truthful portions are offered, not for the narrow purpose of proving merely the truth of those portions, but for the far more significant purpose of showing each conspirator's attempt to lend credence to the entire testimonial presentation and thereby obstruct justice. It would be unacceptably ironic to permit the truthfulness of a portion of a testimonial presentation to provide a basis for keeping from a jury a conspirator's attempt to use that truthful portion to obstruct law enforcement officers in their effort to learn the complete truth." (*Stewart, supra*, 433 F.3d. at pp. 292–293.)

The *Stewart* court concluded, "For these reasons, we hold that when the object of a conspiracy is to obstruct justice, mislead law enforcement officers, or commit similar offenses by making false statements to investigating officers, truthful statements made to such officers designed to lend credence to the false statements and hence advance the conspiracy are not rendered inadmissible by the Confrontation Clause. A contrary reading of the rule would result in obvious and unacceptable impediments to prosecuting cases like this one, in which the very object of the charged conspiracy is for the defendants to mislead investigators by responding falsely to the investigators' questions in a structured setting, fully aware that their responses might be used in future judicial proceedings. For these reasons, there was no error here in admitting the testimonial statements of one Defendant against the other." (*Stewart, supra*, 433 F.3d at p. 293, fn. omitted.)

While there was a charged conspiracy to obstruct justice in *Stewart*, the *Stewart* court's comments apply with equal force to the present case, in which the uncharged conspiracy included a plan to mislead law enforcement officers who were investigating MacNeil's murder. Gann and Hansen's plan to make it appear that MacNeil was murdered by a masked intruder during a home invasion robbery was, in essence, a plan to obstruct justice, and all of Hansen's prearrest statements to Detective Rivera—both truthful and untruthful—were made in furtherance of the conspiracy.

As in *Stewart*, any truthful statements that Hansen made to Detective Rivera prior to her arrest were "designed to lend credence to the false statements and hence advance the conspiracy." (*Stewart, supra*, 433 F.3d at p. 293.) For these reasons, we conclude that such statements were not inadmissible under the confrontation clause.[10]

### 3. Claimed instructional error

Gann contends that the trial court erred by instructing the jury pursuant to CALCRIM No. 418 as follows:

"In deciding whether the People have proved that the defendant NATHANIEL GANN committed the crime charged, you may not consider any statement made out of court by BRAE HANSEN unless the People have proved by a preponderance of the evidence that:

"1. Some evidence other than the statement itself establishes that a conspiracy to commit a crime existed when the statement was made; .

---

[10] With respect to any false statements that Hansen made to Detective Rivera, such statements clearly were not offered for their truth, and are thus not "testimonial." Indeed, during Gann's first trial, the prosecutor responded to a hearsay objection to Hansen's prearrest statements by arguing that he was not offering Hansen's statements "for the truth of the matter asserted. In fact, I am going to argue that she's lying through the teeth the whole time."

"2. [BRAE] HANSEN was a member of and participating in the conspiracy when she made the statement;

"3. [BRAE] HANSEN made the statement in order to further the goal of the conspiracy; [and]

"4. The statement was made before or during the time that the defendants were participating in the conspiracy.

"A *statement* means an oral or written expression, or nonverbal conduct intended to be a substitute for an oral or written expression.

"*Proof by a preponderance of the evidence* is a different standard of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you [conclude] that it is more likely than not that the fact is true."

Gann maintains that the conspiracy ended with the murder of MacNeil, and that this instruction erroneously allowed the jury to consider a statement that Hansen made after the conspiracy had terminated. As indicated above, we have determined that the trial court reasonably concluded that the conspiracy did not terminate with MacNeil's murder, but rather, that the conspiracy included an agreement to make it appear that MacNeil was murdered during a home invasion robbery. Accordingly, the trial court did not err in instructing the jury pursuant to CALCRIM No. 418.

B.–E.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV.

HANSEN'S APPEAL[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante*, page 994.

## V.

## DISPOSITION

As to Gann, the judgment is affirmed.

As to Hansen, the trial court is directed to (1) strike the $1,000 parole restitution fine under section 1202.45; (2) prepare an amended abstract of judgment; and (3) forward the amended abstract to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

Haller, Acting P. J., and McIntyre, J., concurred.

A petition for a rehearing was denied April 7, 2011, and the petition of appellant Brae F. Hansen for review by the Supreme Court was denied July 20, 2011, S192631. Werdegar, J., was of the opinion that the petition should be granted.