Filed 8/18/14  P. v. Tuff CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049321 |
| v. | (Super. Ct. Nos. RIF10003935 & RIF10002515) |
| RASHAWN ANTHONY TUFF and DWAYNE MATTHEWS, | O P I N I O N |
| Defendants and Appellants. | |

Appeals from judgments of the Superior Court of Riverside County, Jeffrey Prevost, Judge.  One judgment affirmed in part and reversed in part.  One judgment affirmed and remanded with directions to modify the sentence.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant Rashawn Anthony Tuff.

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant Dwayne Matthews.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

\*         \*         \*

A jury found defendants Rashawn Anthony Tuff and Dwayne Matthews guilty of two counts of robbery with true findings on firearm use allegations, one count each of burglary, assault with a semiautomatic firearm and simple assault, plus two counts each of making criminal threats, maliciously intimidating a witness, and false imprisonment. Tuff was also convicted of two crimes arising from a separate incident. Both defendants were found not guilty of kidnapping. The court imposed prison sentences of 28 years 8 months on Matthews and 17 years 4 months on Tuff.

On appeal, Matthews asserts the trial court erred by admitting defendants' incriminatory statements under the coconspirator hearsay exception and by failing to instruct the jury on the use of this evidence. Tuff argues there is insufficient evidence to support his conviction as an aider and abettor on several counts and that the trial court committed sentencing errors. To the extent applicable, each defendant joins in the other's appellate claims. We affirm the defendants' convictions, but agree the trial court committed sentencing errors. On Tuff, we reverse the sentence and remand for resentencing. On Matthews, we remand with directions to prepare an amended abstract of judgment modifying his sentence.

FACTS

One afternoon, defendants and Angelo Will carried out a home invasion robbery. Around 3:00 p.m., Inder Jit and one of his sons left home to conduct the

2

family's ice cream truck business.  Sometime thereafter, Matthews and Will, wearing masks and gloves and armed with guns, entered the home and confronted Prem Rani, and her daughter, Suman Jit.  Tuff, acting as a lookout and driver, remained outside in a car.

Suman Jit initially ran to the garage but, concerned for her mother, she reentered the house.  Matthews and Will placed Suman Jit in an interior windowless bathroom and duct taped her mouth, arms, and ankles.  They also duct taped Rani's hands together.  For 30 to 40 minutes, Matthews and Will dragged Rani around the house demanding money and jewelry and the location of a safe, pointing their weapons at both victims and threatening to shoot if she failed to comply.  While walking down the stairs after searching some bedrooms, one of the assailants struck Rani on the side of the head with the gun.

Matthews and Will eventually left the home taking with them a black bag containing jewelry, some cash, and a shotgun.  Before doing so, one of them kicked Rani while she lay face down on the floor complaining she "told me nothing."  They also cut the home's landline, told the victims not to call the police, and threatened to return and shoot them if the family reported what occurred.

Ignoring defendants' threats, the family did call the police.  The next day, all three defendants were arrested as they attempted to sell the Jit family's jewelry at a pawn shop.  Tuff was carrying a ring and Matthews wearing a watch that had been taken during the robbery.  In the car used by defendants the police found a roll of duct tape.  A search of the residence where all three defendants lived revealed two handguns and two pairs of gloves.

The police seized each defendant's cell phone.  Matthews's cell phone contained text messages sent to a third party two days before the robbery, stating "'[w]e have been doing homework . . . for a while'" on a "big lick" that "[f]or sure [had] bread in it."  Matthews testified the term "lick" meant getting money and claimed the text

3

messages referred to both a drug transaction and his effort to record and release a rap music album. However, a deputy sheriff testified "lick" was slang for "some type of theft," while the reference to "bread" meant "money or something of value." Another text message sent to Matthews referred to the use of a "burner," meaning a gun. On Tuff's cell phone the police found a text message sent to Matthews's cell phone during the robbery stating, "'Watch that garage on the left . . ., someone is sitting in there.'"

DISCUSSION

1. *Admission of Defendants' Statements*

    *a. Introduction*

    Before trial, Will pleaded guilty to one count of burglary and two counts of robbery and admitted personally using a firearm as to one robbery count. The prosecution called him as a witness, but he exercised his privilege against self-incrimination.

    The prosecution also called Amanda Sanchez as a witness. She was an acquaintance of defendants and Will. Before their arrest Sanchez frequently spent time at Will's home where the three men lived, drinking and conversing with them. She said it was common to see Will, Tuff, and Matthews together.

    Over defendants' objections, the court allowed Sanchez to testify to statements made by Will, Matthews, and Tuff, holding this evidence was admissible under the coconspirator hearsay exception. According to Sanchez, a week before the robbery she heard "bits and pieces" of conversations among the three men about robbing an Indian family that owned ice cream trucks. She admitted loaning her car to them to carry out the plan. On the day of the robbery, after Will, Tuff, and Matthews dropped her off at home, Sanchez received a text stating, "'We're going to work.'" She knew Will,

4

Tuff, and Matthews did not have jobs and explained the text meant "they were doing something . . . illegal." Later, the three men returned to Sanchez's home bringing with them a bag of jewelry, plus some cash. They left the bag containing the jewelry with her.

Early the next day, Sanchez received a text from Matthews stating, "We need the whip," slang for a car, "'So we can go cash out.'" After Sanchez returned home from work, she received another text message from Tuff asking her to "get the jewelry and come over so we can go." She gave the three men her car, but they never returned.

### b. Analysis

Defendants attack the trial court's decision allowing Sanchez to testify to statements made by them and their confederate Will. They contend the prosecution failed to independently establish the existence of a conspiracy or that the statements were made in furtherance of it. In addition, defendants claim the admission of the statements violated their constitutional right of confrontation. (*Bruton v. United States* (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476] (*Bruton*); *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*).) We conclude their arguments lack merit.

Evidence Code section 1223 declares: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence." Under this exception, a coconspirator's statement is admissible against other members or the conspiracy where "the offering party presents 'independent evidence to establish prima facie the existence

5

of . . . [a] conspiracy[,]'" plus "three preliminary facts . . .: '(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy.'" (*People v. Hardy* (1992) 2 Cal.4th 86, 139; see *People v. Homick* (2012) 55 Cal.4th 816, 871.)

For purposes of admitting evidence under Evidence Code section 1223, a defendant need not be charged with the crime of conspiracy. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1134; *People v. Gann* (2011) 193 Cal.App.4th 994, 1005.) We review the trial court's ruling on the admissibility of evidence for abuse of discretion. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007-1008.)

Contrary to defendants' claims, if the conditions for admitting evidence under Evidence Code section 1223 are satisfied, the use of this evidence would not violate the *Bruton/Aranda* rule. Numerous cases have recognized the admission of a statement under coconspirator hearsay exception does not violate a defendant's right to confront and cross-examine witnesses. (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1135; *People v. Brawley* (1969) 1 Cal.3d 277, 286; *People v. Earnest* (1975) 53 Cal.App.3d 734, 743-744.) As explained in *People v. Smith* (2005) 135 Cal.App.4th 914, the *Bruton/Aranda* rule is based on the presumption "the statement is . . . inadmissible hearsay against the codefendant" (*id.* at p. 922). Thus, where "the statement is *admissible* against the codefendant under a hearsay exception, and its admission otherwise survives confrontation analysis, then the jury may consider it against the codefendant . . . ." (*Ibid.*)

To establish the existence of a conspiracy, the prosecution need only make a prima facie showing "'by means of any competent evidence which tends to show that a conspiracy existed.'" (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1134.) Its existence "'may be inferred from the conduct, relationship, interests, and activities of the alleged

conspirators before and during the alleged conspiracy'" (*id.* at p. 1135), including "the conduct of the defendants mutually carrying out a common purpose in violation of a penal statute." (*People v. Gann, supra,* 193 Cal.App.4th at pp. 1005-1006.)

The evidence supports the trial court's finding the prosecution made a prima facie showing that defendants and Will agreed to commit the home invasion robbery for the purpose of obtaining money or other valuables, including jewelry, which they could pawn, and committed overt acts to accomplish their plan. The three men lived at the same residence, sharing the same bedroom, and were commonly seen together. Sanchez testified that the day of the robbery, the three men jointly borrowed her car. The assailants used duct tape similar to that later found in Sanchez's car to restrain the victims, and demanded jewelry and cash. Later the same day, the three men returned Sanchez's car, possessing a bag containing jewelry and cash. The next day, they again jointly borrowed Sanchez's car, retrieved the bag of jewelry from her, and drove to a pawn shop where they attempted to sell the jewelry. Although the trial court ruled Sanchez was an accomplice and instructed the jury that to convict defendants her testimony needed to independently corroborated, for purposes of establishing the existence of a conspiracy under Evidence Code section 1223, her testimony, even if not otherwise corroborated, sufficed. (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1134.)

Defendants also argue the prosecution failed to establish the preliminary facts that the statements admitted against them were made by a coconspirator during the conspiracy and in furtherance of it. Not so. The statements introduced at trial were purportedly made by one of the defendants or Will, all three of whom were members of the conspiracy. Sanchez testified she learned most of what she knew about the robbery from Will, but she also said the conversations usually included "two or more" of the three men and that, a week before the home invasion robbery, she knew the three of them were planning to commit the crime because she "heard them talk" about it.

7

"[W]hether [the] statements made [by a coconspirator] are in furtherance of a conspiracy depends on an analysis of the totality of the facts and circumstances in the case." (*People v. Hardy, supra,* 2 Cal.4th at p. 146.) Sanchez's testimony that she overheard defendants and Will discussing their plan to commit a robbery against an Indian family that operated an ice cream truck business "plainly betrays planning behavior in furtherance of the conspiracy." (*In re Hardy* (2007) 41 Cal.4th 977, 996 [coconspirator's statements "that 'someone had asked him if he knew someone that could do a hit . . . and that they would get paid for doing it[]'" and later "tell the same person not to mention the conversation to anyone" in furtherance of conspiracy].) The requests to use Sanchez's car, plus the texts sent to her before the robbery and the day after it occurred, also reflected the perpetrators' efforts to carry out their plan. (*People v. Brawley, supra,* 1 Cal.3d at pp. 284, 288 [coconspirator's query whether witness "knew where some wire and gloves could be found" made "in furtherance of the conspiracy" because he "inquired regarding items that might be used in" committing the crimes].)

Defendants claim the post-robbery statements could not have been made in furtherance of the conspiracy. Again, we disagree. "While a conspiracy is usually deemed to have ended when the substantive crime for which the coconspirators are being tried is either attained or defeated [citation], it is for the trial court to determine precisely when the conspiracy has ended [citation]." (*People v. Gann, supra,* 193 Cal.App.4th at p. 1006.) "Particular circumstances may well disclose a situation where the conspiracy will be deemed to have extended beyond the substantive crime to activities contemplated and undertaken by the conspirators in pursuance of the objectives of the conspiracy." (*People v. Saling* (1972) 7 Cal.3d 844, 852.)

Here, the trial court ruled "the conspiracy was continuing . . . despite the robbery having been completed." The evidence supports its ruling. (*People v. Homick, supra,* 55 Cal.4th at p. 872 [trial court's finding on the continuance of conspiracy binding

8

if supported by the evidence].)  Matthews's cell phone contained a text message to a third party two days before the robbery, stating "[w]e have been doing homework" on a "big lick" that "[f]or sure [had] bread in it."  During the robbery, the assailants demanded both money and jewelry and the very next day borrowed Sanchez's car and told her to bring them the jewelry so they could "cash out."  This evidence indicates the defendants knew or believed the victims had money or valuables that could be converted into money.  Thus, we conclude the trial court properly found the conspiracy continued even after the home invasion robbery had terminated.

The trial court did not abuse its discretion in admitting statements by defendants and Will under Evidence Code section 1223.

*2.  Instructional Error Claim*

Defendants alternatively argue that even if their statements were properly admitted, the trial court erred by failing to instruct the jury with CALCRIM Nos. 416 and 418 concerning evidence of an uncharged conspiracy and the use of statements by a coconspirator.  The Attorney General counters there is no sua sponte requirement to give them, defendants forfeited this contention by failing to request the instructions, and any error in failing to give the instructions did not prejudice defendants.

Concerning a court's sua sponte duty to give instructions, the general rule is that, "even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence," which "are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case."  (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)  Instruction on an uncharged conspiracy is "required" where "[i]t was one of the issues at the trial."  (*People v. Davis* (1957) 48 Cal.2d 241, 250; see *People v. Earnest, supra,* 53 Cal.App.3d at p. 745 ["'Conspiracy' as used in section 1223 of the

9

Evidence Code . . . has a technical legal meaning which requires the court to define it *sua sponte*"].)  Thus, it was necessary for the court to give the jury CALCRIM No. 416.

The Attorney General correctly notes the cases cited in CALCRIM No. 418's use note that declare this instruction must be given sua sponte do not support that statement.  But in *People v. Smith* (1986) 187 Cal.App.3d 666, disapproved on another ground in *People v. Bacigalupo* (1991) 1 Cal.4th 103, 126, fn. 4, the Court of Appeal held it was error for the trial court not to give CALJIC No. 6.24, the parallel version of CALCRIM No. 418, because "[i]n order for the statements to have been considered . . . , the jury was required to make certain preliminary findings, i.e., . . . were the statements made during and in furtherance of an ongoing conspiracy?"  (*People v. Smith, supra,* 187 Cal.App.3d at pp. 679-680.)  Thus, we conclude the court was also obligated to give CALCRIM No. 418 on its own motion.

The Attorney General's forfeiture claim lacks merit as well.  Courts have recognized a defendant may challenge the failure to give an instruction even though he or she failed to request it at trial.  (*People v. Lewis* (2009) 46 Cal.4th 1255, 1318, fn. 46 [challenge to absence of unrequested instruction reviewable "[b]ecause defendant's contentions raise issues concerning his substantial rights"]; *People v. Hernandez* (2009) 180 Cal.App.4th 337, 348 [failure to instruct on unanimity for predicate acts underlying the "One strike" law; reviewable even though no request for instruction at trial].)

Nonetheless, we conclude any error in failing to give these instructions did not prejudice defendants.  Contrary to Matthews's unsupported assertion, the failure to instruct on conspiracy and use of the statements by coconspirators is not federal constitutional error.  The California Supreme Court has repeatedly held any error in this regard is governed by the state law harmless error standard of whether it is "reasonably probable that a result more favorable to [the defendant] as to guilt would have been reached in the absence of the error."  (*People v. Brawley, supra,* 1 Cal.3d at p. 291; see

10

*People v. Prieto* (2003) 30 Cal.4th 226, 251; *People v. Sully* (1991) 53 Cal.3d 1195, 1231-1232.)

There was no reasonable probability defendants would have achieved a more favorable result had the trial court given CALCRIM Nos. 416 and 418. Matthews relies on his testimony at trial. He claimed that Will borrowed both his and Tuff's cell phones and then dropped them off at a residence on his way to commit the home invasion robbery. While awaiting Will's return, Matthews claimed he played a basketball game called 21 with someone he referred to as "June," while Tuff sat nearby. Matthews acknowledged he and Tuff later went to the pawn shop with Will to sell the jewelry taken in the robbery, and that Will agreed to "give [him] a cut" because he told Will where "to cash out the jewelry." Although Matthews claimed to have "family members" in the area near where he played 21, he nonetheless did not know their address, where June lived, June's telephone number, or even June's "real name." It would be charitable to describe his alibi as lacking credibility. Further, we note that to Matthews's and Tuff's benefit the trial court gave the standard instructions to "[c]onsider with caution" their oral statements "tending] to show . . . guilt" (CALCRIM No. 358), and declaring Sanchez was an accomplice whose testimony "should be viewed with caution," which could not be used to convict defendants unless it was supported by independent evidence tending to connect them with the charged offenses (CALCRIM No. 335).

"[T]he . . . test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*People v. Beltran* (2013) 56 Cal.4th 935, 956.) Given the evidence at trial and the

instructions the jury did receive on how to view both their statements and consider Sanchez's testimony, we conclude it is not reasonably probable the jury would have reached a different result had the court also given CALCRIM Nos. 416 and 418.

*3. Sufficiency of the Evidence to Support Tuff's Conviction*

In his briefs, Tuff challenges the sufficiency of the evidence to support his conviction for assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)) in count 6, the lesser included offense of simple assault (Pen. Code, § 240) in count 7, making criminal threats (Pen. Code, § 422) in counts 8 and 9, maliciously intimidating a witness (Pen. Code, § 136.1, subd. (c)(1)) in counts 10 and 11, and felony false imprisonment (Pen. Code, § 236) in counts 12 and 13. Tuff notes he acted as the driver and lookout and never entered the Jit's home and that the prosecution sought to hold him criminally liable for these offenses solely as a direct aider and abettor. He argues that since he was "sitting outside" when Will and Matthews committed the foregoing crimes, the evidence fails to establish he "had the requisite knowledge that Will and Matthews intended to act as described" or that he "intended to assist or encourage those acts." We find Tuff's argument lacks merit.

The standard of review for resolving such claims is well settled. "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with

12

a contrary finding.  [Citation.]  A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.  [Citation.]"  (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

Penal Code section 31 declares "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed."  The Supreme Court "has interpreted section 31 to require that an aider and abettor must act with 'knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and . . . conduct by the aider and abettor that in fact assists the achievement of the crime.  [Citation.]'  [Citation.]"  (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069.)  "'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact.'"  (*People v. Chagolla* (1983) 144 Cal.App.3d 422, 428.)  "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense."  (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094; *People v. Chagolla, supra,* 144 Cal.App.3d at p. 429.)

The prosecution's theory of the case was that Tuff directly aided and abetted the crimes committed by Will and Matthews inside the Jit's home.  The evidence established that Tuff, Will, and Matthews engaged in planning the Jit home invasion robbery for at least a week before carrying it out.  On the day of robbery, the three jointly borrowed Sanchez's car to drive to the Jit's residence.  They took with them semiautomatic weapons to threaten and intimidate the victims, duct tape to restrain them, plus masks and gloves to preclude identification.  The defendants also brought cell phones to communicate with each other, which Tuff, acting as lookout, employed to inform Will and Matthews when Suman Jit fled to the garage.

13

Tuff acknowledges the evidence supports a finding that he acted as lookout and getaway driver while Matthews and Will entered the Jit's home and robbed the victims. But he repeatedly claims there is a "lack of evidence" he "had the requisite knowledge and intent to prove he aided and abetted" assaulting, threatening, intimidating, and falsely imprisoning the victims. Granted, the "aider and abettor's mental state must be at least that required of the direct perpetrator[,]" and "'[w]hen the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator[,]"'" which "'occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime."'" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) But given the evidence of planning, preparation, and coordinated activity by the three perpetrators, a reasonable jury could conclude they jointly agreed to assault, threaten, intimidate, and restrain their victims in an effort to ensure the success of their criminal enterprise. In short, if Tuff was in for a penny, he was in for a pound.

Thus, we conclude the evidence supports the verdicts finding Tuff guilty of the assaults, making criminal threats, witness intimidation, and false imprisonment.

*4. Sentencing Claims*

At the sentencing hearing, the court imposed a 28 year 8 month prison term on Matthews, calculated as follows: 6 years for one robbery plus 10 years for the attached firearm use allegation, a consecutive 16 months on the second robbery count with 3 years 4 months for the attached firearm use allegation, a consecutive 2-year term for the assault with a semiautomatic firearm, and consecutive 3-year terms for each witness intimidation count. The court imposed concurrent terms for the remaining counts, with the sentences for the criminal threats and false imprisonment counts stayed under Penal Code section 654, subdivision (a).

14

The court sentenced Tuff to a 17 year 4 month prison term calculated as follows: 6 years on the assault with a semiautomatic firearm, 16 months consecutive for each robbery count with a consecutive 1-year term for each of the attached firearm enhancements, 3-year consecutive terms on each witness intimidation count plus 8 months for his conviction of carrying a loaded firearm during the unrelated incident. Concurrent terms were imposed on the remaining counts with the sentences for the criminal threats and false imprisonment counts also stayed. (Pen. Code, § 654, subd. (a).

In his appellate briefs, Tuff asserts several sentencing errors. Matthews's brief incorporates Tuff's sentencing arguments to the extent they are applicable to him.

One issue is whether Penal Code section 654 precludes imposing sentences for both the robbery and assault counts. That statute declares, "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Pen. Code, § 654, subd. (a).) The Supreme Court has held the section applies "'where a course of conduct violate[s] more than one statute,'" and "all of the offenses [are]ncident to one objective." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, overruled on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 334.) Whether a defendant harbored more than one objective during a course of conduct is a question of fact and the trial court's finding will be upheld if supported by substantial evidence. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368; *People v. Watts* (1999) 76 Cal.App.4th 1250, 1265.)

On the two robbery convictions, it is well settled a defendant "may nevertheless be punished for multiple convictions if during the course of that conduct he committed crimes of violence against different victims." (*People v. Miller* (1977) 18 Cal.3d 873, 885.) "Robbery is violent conduct warranting separate punishment for the injury inflicted on each robbery victim." (*People v. Champion* (1995) 9 Cal.4th 879, 935,

15

overruled on another ground in *People v Combs* (2004) 34 Cal.4th 821, 860; see *People v. Thurs* (1986) 176 Cal.App.3d 448, 451-452.) Thus, it is proper for the court to sentence on each robbery.

Tuff was outside acting as the lookout when Matthews and Will entered the Jit home and confronted Prem Rani and Suman Jit, pointing firearms at their heads and threatening to shoot if the victims. He argues the robberies and assaults were committed with the single objective of facilitating the home invasion robbery. Thus, the trial court erred by failing to stay his sentence for the robbery of Prem Rani and the simple assault. The Attorney General agrees with Tuff on this point and so do we.

But as to Matthews the record supports the consecutive term imposed on him for the felony assault conviction. In rejecting his request to stay the punishment on this charge, the court cited the striking of Prem Rani as she was descending the stairs, noting she "was already complying with [her] captors . . . bound at her hands . . . and was descending the stairs as demanded of her. Furthermore, while the defendants may not have liked her responses to their demands . . ., her responses were actually compliant, given that a safe did not exist."

In *Watts*, the Court of Appeal upheld separate sentences imposed on a defendant who assaulted the victims while in the processing of robbing them. "As to the victims here, there was evidence that each was assaulted either as she was attempting to comply with her assailant's demand for money or was attempting to escape. . . . The evidence accordingly shows that the robberies were well under way at the time the assaults occurred, and thus supports the conclusion of the trial court that the assaults therefore were not simply a means of committing the robberies." (*People v. Watts, supra,* 76 Cal.App.4th at p. 1265.) The evidence here supports a similar result. Rani did not resist Matthews and Will. The act of striking her was committed, not as a means of carrying out the robberies, but due to the assailants' frustration in not locating the safe

16

they believed the family kept in the home. Consequently, we conclude Matthews cannot challenge his consecutive sentences for both of the robberies and the felony assault.

Another issue is whether the court erred by imposing consecutive sentences on each defendant for their convictions of witness intimidation. We conclude these sentences should also have been stayed.

As discussed, the evidence shows defendants and Will planned a home invasion robbery to steal the Jit family's money and other valuables and to quickly sell the noncash property. During closing argument, the prosecutor cited testimony by Prem Rani and Suman Jit that the perpetrators told them to keep their heads down, said "'Don't look at us,'" and threatened to return and shoot them if the family called the police as the factual basis for convicting defendants of witness intimidation. Thus, it appears these statements were part of the indivisible course of conduct intended to assist in successfully committing the home invasion robbery. The Attorney General's claim the threats were merely additional acts of gratuitous violence is not supported by anything in the record.

At the sentencing hearing, the trial court relied on Penal Code section 1170.15 to impose consecutive sentences for the witness intimidation counts. That statute declares, "Notwithstanding subdivision (a) of Section 1170.1 which provides for the imposition of a subordinate term for a consecutive offense of one-third of the middle term of imprisonment, if a person is convicted of a felony, and of an additional felony that is a violation of Section 136.1 . . . that was committed against the victim . . ., the subordinate term for each consecutive offense that is a felony described in this section shall consist of the full middle term of imprisonment for the felony for which a consecutive term of imprisonment is imposed . . . ."

This statute authorizes a court to impose a full consecutive middle term when imposing a subordinate sentence for witness intimidation. But as defendants note, Penal Code section 654, subdivision (a) applies regardless of whether a court imposes a

17

concurrent or a consecutive sentence for a separate offense arising from an indivisible course of conduct. (*People v. Deloza* (1998) 18 Cal.4th 585, 594 ["Section 654 does not allow *any* multiple punishment, whether concurrent or consecutive"].)

The Supreme Court has also recognized, "with respect to statutes employing the . . . 'notwithstanding' language, that a statute may prevent or negate the operation of section 654 even in the absence of an express reference to that provision." (*People v. Duff* (2010) 50 Cal.4th 787, 798; see *People v. Palacios* (2007) 41 Cal.4th 720, 730; *People v. Benson* (1998) 18 Cal.4th 24, 32.) But each of the foregoing cases involved a statute using the phrase "notwithstanding any other law" or similar language. (*People v. Duff, supra,* 50 Cal.4th at p. 798.) Penal Code section 1170.15's "Notwithstanding" language is limited to negating the one-third the middle term provision of Penal Code section 1170.1, subdivision (a). Thus, we conclude Penal Code section 654, subdivision (a) applies to defendants' convictions for witness intimidation and the trial court erred in failing to stay the sentences on these counts.

The final issue, which concerns Tuff alone, is the trial court error in imposing full 1-year terms on the firearm enhancements attached to his robbery convictions (Pen. Code, § 12022, subd. (a)(1)). This ruling violated Penal Code section 1170.1, subdivision (a), which limits an enhancement imposed that is applicable to a subordinate term to "one-third of the term . . . for [the] . . . enhancement[]." However, due to the other significant errors in Tuff's sentence, we conclude the proper result is to affirm his convictions and remand his case for a new sentencing hearing. (*People v. Woods* (2010) 191 Cal.App.4th 269, 273.)

DISPOSITION

The appellants' convictions are affirmed. On appellant Tuff, the sentence is reversed and the matter remanded to the superior court for resentencing. On appellant

18

Matthews, the matter is remanded to the superior court with directions to prepare an amended abstract of judgment staying the terms imposed on counts 7, 10 and 11 pursuant to Penal Code section 654, subdivision (a) and to send the amended abstract of judgment to the Department of Corrections and Rehabilitation.

                                                RYLAARSDAM, ACTING P. J.

WE CONCUR:


BEDSWORTH, J.


FYBEL, J.