Filed 1/23/15  P. v. Mason CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D064039 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD233960) |
| MICHAEL BARAKA MASON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed.

Cannon & Harris and Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Michael Baraka Mason of five counts of conspiracy to send drugs into jail, where he was an inmate.  (Pen. Code, § 182, subd. (a)(1), counts 1, 4, 7, 10, 13; all further references are to this code unless noted.)  He was also convicted of two counts of smuggling controlled substances into jail.

(§ 4573; counts 3, 15.) The jury did not find true any of the accompanying gang enhancement allegations. (§ 186.22, subd. (b)(l).) Three of four prior conviction allegations were found true.

After a new trial motion was denied, Michael Mason was sentenced to an aggregate term of 13 years four months in prison, to be served consecutively with a sentence imposed in a different case.[1] The court denied probation and ordered that for each of the five conspiracy counts, he would serve two years eight months (1/3 of the midterm of four years, doubled). On counts 3 and 15 (substantive smuggling offenses), the sentences imposed were stayed under section 654. Other counts on which verdicts were not reached were dismissed (counts 6, 9, 12).

While this separate appeal was pending, this Court resolved an appeal by Michael's codefendant and wife Cristina Mason. (*People v. Mason* (Aug. 13, 2014, D064346) [nonpub. opn.] (the previous appeal); we shall refer to these two married persons by first names for convenience.) Based on the same sets of facts presented at their joint trial, Cristina was convicted of the same five counts of conspiracy to furnish drugs to a person in custody (counts 1, 13; but counts 4, 7, 10 were for conspiracy for attempted furnishing). (§ 182, subd. (a)(1).) The jury also convicted Cristina of two

---

[1]    In case No. SCD 214650, Michael Baraka Mason received a 30-year determinate term, plus nine consecutive LWOP terms, with other lengthy consecutive terms imposed as well. He appealed and on December 15, 2014, this court reversed in part and affirmed as modified. (Case No. D063793.)

2

counts of attempting to furnish drugs (counts 2, 14). (§§ 664/4573.9, subd. (a); other counts as to Cristina dismissed.)[2] We affirmed the judgment.

In the current appeal, Michael contends that on all the conspiracy counts, the jury was not properly instructed, sua sponte, on whether a single or multiple conspiracies were formed. Further, he argues the trial court abused its discretion by admitting prejudicial evidence over his hearsay objections. (Evid. Code, § 352, 1223 [coconspirator exception].) Michael then claims the evidence is not sufficient to support any conclusion that more than one such conspiracy agreement existed. (See, e.g., *People v. Jasso* (2006) 142 Cal.App.4th 1213, 1220 (*Jasso*).) Finally, Michael contends the trial court erred or abused its discretion by failing to investigate adequately an allegation of juror misconduct.

We find no instructional or evidentiary error, nor any abuse of discretion regarding the extent of the investigation into the alleged jury misconduct. We affirm.

FACTUAL AND PROCEDURAL HISTORY

A. *Shipments and Investigation*

As summarized in the previous appeal, the facts of the conspiracy allegations to accomplish the target smuggling offenses can be outlined somewhat briefly, to provide context for the discussion which follows. Beginning in 2008, Michael was held in jail pending trial on other charges. (See fn. 1, *ante*.) Michael had Lincoln Park Blood gang ties and had participated in running the gang's prostitution business. He also ran a music

---

[2]     In brief, section 4573.9 makes it a felony for an unauthorized person who is not in custody (Cristina) to furnish a controlled substance to a person who is in custody (Michael).

business with Cristina, his girlfriend and wife, and it was unclear if she had worked for him as a prostitute. Michael and Cristina often talked on the telephone five or six times a day on business and other matters, and she put money into his bank account and into the accounts of 14 inmates at the jail. She also posted bail or arranged other assistance for gang members when Michael told her to do so.

At the George Bailey and Vista detention facilities, authorities were monitoring telephone calls by Michael and others to Cristina, over periods including the eight months when the packages giving rise to these conspiracy counts were being intercepted. Conspiracy count 1 (and his smuggling count 3) arose out of a package delivered in August 2010 to a prisoner lodged in his module, Patrick Gladney, that was addressed in handwriting similar to other mail items Michael had received. The package was stamped "legal mail," was intercepted and heroin discovered inside. It had a false return address from an attorney, and Cristina's fingerprint was later found on the package. Another similar package sent to Gladney's cell mate earlier had the same return address zip code, and it had contraband tobacco concealed in it.

Conspiracy count 4 was based on a package received in November 2010 by another inmate in Michael's module, Ronnell Davis. The stamps on it were not canceled, possibly because it did not travel through the postal system, and it looked like a photo mailer and had bulges on the side that were found to contain heroin. Sheriff's Department Detective Derek Williamson, a jail official, came to believe that Michael, a Lincoln Park gang member, was involved in heroin smuggling, and that there might be a compromised jail employee involved. Williamson had Michael transferred to the Vista

4

detention facility, where he would not have a good peer support system and would be more carefully watched.

The day Michael was transferred, he called Cristina and talked about finding a 24-hour postal place, which Cristina said she would investigate. They talked about how he did not want to have to ask fellow inmates there for anything. Conspiracy count 7 was based on a "duck" printed photo mailer package received in December 2010 by Michael at the Vista facility. It was intercepted and found to contain heroin. Count 10 was based on another intercepted photo mailer package sent to Michael in December 2010, containing heroin.

Michael was transferred back to the George Bailey detention facility, where count 13 (and his smuggling count 15) arose. Michael's personal identification number (PIN) was used to make several telephone calls to Cristina in early April 2011. In another phone call around the same time, an inmate told Cristina that he was calling on Michael's behalf to see whether she had any messages for him, and Cristina told him that she talked to Judy and Ray. Later in a phone call, Cristina told Michael he should soon be receiving pictures of her "in the candy aisle."

Shortly thereafter in early April 2011, jail deputies intercepted two packages containing different books, addressed to Michael. The first book had a bulge in its spine, which turned out to be heroin. A postal inspector and a detective testified that postal surveillance video showed Cristina mailing that package. A second book that was sent had a bulge in its spine, which turned out to be contraband cut-up photos of a naked woman, Cristina.

5

In March 2010, a search warrant was executed to search Cristina's home. Detectives found 19 unused envelopes with the return address of a local attorney, addressed to inmates, as well as a stamp that said "Legal Mail." The attorney had not authorized such a use of his address. Detectives also found a book with an altered spine, containing methamphetamine, as well as other mailing envelopes that looked like the intercepted envelopes.

Detectives seized telephones and computers from Cristina's house. The forensic examiner recovered e-mail receipts from Amazon.com for books sent to Michael at both detention facilities but confiscated, listing either Cristina or "Meshell Gosse" as the shipper. The receipts were altered and repeatedly used the same bar codes and order identification numbers. The examiner recovered a number of e-mail addresses used on the computer that had gang references ("lovetheblood") and references to names used by Michael (Don Diego), or his music business ("mafiamubaby" or "damafiamu") and by Cristina (e.g., Donna Cherry, for her escort business).

B. *Trial Proceedings*

In the second amended information, the conspiracy charges jointly named Michael and Cristina as participants, as well as other unknown individuals who had participated in the overt acts towards committing the crimes of giving a controlled substance to a person in custody.

Michael presented his own testimony and that of numerous witnesses, including his gang expert, private investigator Graham McGruer. McGruer told the jury that the Mexican Mafia (or EME) is a prison gang operating to control prisoners in correctional

6

facilities. They exact a tax from nonmembers who are planning on conducting criminal activity in the facility, and enforce it with death or injury. The Mexican Mafia also forces people to bring drugs into prison.

A search warrant executed at Cristina's house found a money order that was made out to a Hispanic individual, the brother of a known high ranking inmate in the Mexican Mafia, who was housed at the George Bailey detention facility. Detective Williamson, testifying as a gang expert for the prosecution, explained that such inmates are shot-callers who collect taxes from other inmates to allow them to operate illicit businesses behind bars.

Michael testified about how he was falsely accused by the Mexican Mafia of killing one of their family members, and was required to pay them protection on a monthly basis, using Cristina as a go between. Because of his own wealth, Michael said he did not need to sell drugs in jail for his own profit. He admitted to smuggling drugs with the assistance of Cristina. He did so because the Mexican Mafia directed him to import drugs into the jail, and its members delivered the drugs to Cristina and instructed her how to send them on to Michael, so he could turn them over to the Mafia members. To protect her, he told her she was sending him chewing tobacco. If the drugs were intercepted, Michael had to pay them more protection money, which he was able to do.

At trial, Detective Williamson played for the jury 15 recordings of jail calls between Cristina and Michael, and between Cristina and other inmates and/or Michael. Out of eight months of recorded jail phone calls, he had listened to calls from the time periods around when the smuggling incidents occurred, because there were so many

phone calls between Michael and Cristina that he had to be selective to get his work done.

Michael and fellow inmates often talked to Cristina on the telephone about "Judy," "Ray," or "Rudy Huxtable," and making arrangements to call them, get in touch with them or meet them. Some inmate voices said they were acting as messengers for Michael when he was in the hole and unavailable, and Cristina arranged three-way calls for them and for Michael. Some of the other voices speaking on calls between Cristina and Michael had Mexican accents. Topics discussed included getting money orders from a wiring service, buying or selling a camera or car, and getting flyers or CDs distributed for their music business. They talked about getting some "duck things" (mailers?) and fixing whatever didn't work out.

Based on his work experience as a jail investigator, Williamson testified that he interpreted some of the expressions used repeatedly in Cristina's and Michael's calls as code words that were arrangements for drug smuggling. For example, there were comments in some of the phone calls possibly referring to an inside jail employee who might be involved (using a "24 hour postal place"). When Michael and Cristina discussed wrapping and delivering album covers, calling or getting in touch with "Judy," "Ray," or "Rudy Huxtable," or getting some duck things, Williamson believed they were talking about drug deliveries.

Other witnesses testifying in Michael's defense described several alternative explanations for apparent gang-related expressions they and their associates used in

8

telephone calls and in their music and video businesses.  Their businesses had the impacts of unifying gang members in different neighborhoods.

The court and counsel held numerous discussions about evidentiary disputes, such as the admissibility of gang evidence about the Mexican Mafia.  The court instructed the jury, inter alia, on the elements of conspiracy and the requirements of overt acts for each count.  Michael's requested jury instruction was given in support of his defense of duress, based on his claim he had participated in smuggling drugs only in response to threats to his life, and "perhaps" to his wife, made by Mexican Mafia members.

The jury convicted Michael of two counts of smuggling drugs into jail, and five counts of conspiracy to do the same, but did not find the gang allegations true.  He was sentenced, as above, and brought this appeal.

DISCUSSION

For topics that are common to Cristina's previous appeal, we set forth as adapted the legal analysis set forth of Cristina's claims, where Michael has presented essentially identical arguments on an identical record.  Regarding the requests for sua sponte instructions about the number of conspiracies proven (pt. I, *post*), as well as the sufficiency of the evidence (pt. III, *post*), we reach the same results, that there was no such trial court instructional duty on this record and no insufficiency of the evidence.  Similarly, in part IV, we explain that the trial court fulfilled the applicable duties to investigate allegations of jury misconduct.

Michael's arguments of evidentiary error concerning the jail calls' admissibility and that of Detective Williamson's expert testimony for interpretation of them will be separately addressed in part II, *post*.

I

*CONSPIRACY ISSUES: SUA SPONTE INSTRUCTIONS*

On appeal, Michael does not dispute that the evidence was sufficient to establish that Cristina sent contraband to him and his associates, and he does not argue for reversal of his two smuggling convictions. However, he contends the trial court erred by failing to instruct the jury, sua sponte, that it had to decide whether he and Cristina engaged in either a single ongoing conspiracy, or multiple ones.

A. Instructional Duties: Review

In criminal cases, " ' "even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

In deciding which issues were adequately raised by substantial evidence at trial to create an entitlement to sua sponte instruction on them, the courts will not evaluate the credibility of witnesses, as that is the jury's prerogative. (*Breverman, supra*, 19 Cal.4th at p. 162.) On review in this context, we construe the evidence in the light most favorable to the appellant. (*People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, fn. 5.) We

examine whether substantial evidence was presented to require the trial court to instruct on general principles of law relevant to those issues, here, the existence of one or instead, multiple conspiracies. (See *Breverman, supra*, at pp. 154, 162.)

B. Legal Principles: Conspiracy

The crime of conspiracy has the purpose of punishing an agreement to act unlawfully. " 'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act, "by one or more of the parties to such agreement" in furtherance of the conspiracy.' " (*People v. Johnson* (2013) 57 Cal.4th 250, 257, quoting *People v. Morante* (1999) 20 Cal.4th 403, 416.) A criminal conspiracy may be shown by direct or circumstantial evidence that the parties came to a mutual understanding to accomplish an act with an unlawful design. (*Johnson, supra*, at p. 264.)

" 'Where two or more persons agree to commit a number of criminal acts, the test of whether a single conspiracy has been formed is whether the acts "were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result." ' [Citation.] 'Relevant factors to consider in determining this issue include whether the crimes involved the same motives, were to occur in the same time and place and by the same means,' and targeted a single or multiple victims." (*People v. Meneses* (2008) 165 Cal.App.4th 1648, 1672 (*Meneses*), citing *People v. McLead* (1990) 225 Cal.App.3d 906, 920.)

11

" ' "A conspiracy is not necessarily a single event which unalterably takes place at a particular point in time when the participants reach a formal agreement; it may be flexible, occurring over a period of time and changing in response to changed circumstances." [Citation.]' " (*People v. Gann* (2011) 193 Cal.App.4th 994, 1005-1006 (*Gann*), citing *People v. Vargas* (2001) 91 Cal.App.4th 506, 553.)

"It is well settled that the essence of the crime of conspiracy is the agreement, and thus it is the number of the agreements (not the number of the victims or number of statutes violated) that determine the number of the conspiracies. . . .  'The gist of the crime of conspiracy . . . is the agreement or confederation of the conspirators to commit one or more unlawful acts. . . .' [Citation.]  ' "The conspiracy is the crime and that is one, however diverse its objects." ' " (*Meneses, supra*, 165 Cal.App.4th at pp. 1669-1670, citing *Braverman v. U.S.* (1942) 317 U.S. at p. 54 (*Braverman*).)

As explained in *Meneses, supra*, 165 Cal.App.4th 1648, 1668, there is a split of authority among California intermediate appellate courts on whether a sua sponte duty applies, for instruction of a jury on the existence of single or multiple conspiracies, where the evidence would support alternative findings on the number of agreements involved. (*Jasso, supra*, 142 Cal.App.4th at p. 1220.)  There is also disagreement about whether it should be a question of fact for the jury to decide if the evidence shows a single conspiracy or multiple conspiracies. (*Meneses, supra*, at p. 1668; *People v. Morocco* (1987) 191 Cal.App.3d 1449, 1453; but see *People v. Davis* (1989) 211 Cal.App.3d 317, 322-323; *People v. Liu* (1996) 46 Cal.App.4th 1119, 1133.)

## C. Contentions and Analysis

Michael argues the evidence would have supported alternate findings on whether a single conspiracy or multiple conspiracies existed for making these shipments of drugs, and therefore such a sua sponte instructional duty arose. He claims there was no direct evidence of any agreement or agreements between himself, his wife, or any third party to smuggle drugs. (*Jasso*, *supra*, 142 Cal.App.4th at pp. 1220-1221; *Vargas, supra*, 91 Cal.App.4th at pp. 554.) Hence, different inferences about the number of agreements reached could have been drawn by the jury, which was required to resolve all issues presented by the circumstantial evidence.

Michael assumes that the jail phone calls demonstrated that a prearranged set of code words was used to accomplish the delivery of drugs into prison. He argues this evidence demonstrates there was one prearranged, ongoing conspiracy agreement, with a single objective, and it was carried out through multiple attempts. Michael argues that even though numerous voices were heard on the jail phone calls, and numerous methods of smuggling were used, all those activities must have been directed toward a single pre-existing objective, smuggling drugs into jail.

Although the Attorney General claims that Michael has forfeited this agreement by failing at trial to request an instruction on the number of conspiracies proven, we deem it appropriate to examine the record for any substantial support for such an instruction. Even accepting that the number of statutes violated is not determinative, and that the number of agreements is what counts (*Braverman, supra*, 317 U.S. at p. 53), this record shows more than one agreement with different terms was reached, and at least five conspiracies were

13

demonstrated. From the circumstantial evidence of the relationship between Michael and Cristina, combined with the nature of the different shipments that used different packaging over a period of eight months, a reasonable conclusion can be drawn that there were separate agreements reached, based on a distinct set of circumstances for each shipment.

Taken as a whole, the evidence showed these agreements were "distinct and disconnected, not part of a larger all-inclusive combination directed to a single unlawful end." (*Meneses, supra*, 165 Cal.App.4th at p. 1672.) Because there were different combinations of participants, addressees, messengers, packaging materials, methods of concealment, and shipments from different locations, over different time periods, reasonable inferences arise that more than one type of agreement was necessary to adapt to the changing circumstances of confinement. (*Gann, supra*, 193 Cal.App.4th at pp. 1005-1006.) Although there was consistency among the coded language used in the phone calls for arranging transactions ("Judy" and "Ray," "Rudy Huxtable," album covers), there were different participants who gave Cristina instructions, with different results. At times she expressed confusion or asked for clarification, and then followed through, but in different ways depending on how the last shipments had gone.

This was not clearly a case in which one overall agreement among various parties existed, "to perform various functions in order to carry out the objectives of the conspiracy." (*Jasso, supra*, 142 Cal.App.4th at p. 1220.) The nature of these agreements for particular kinds of packaging necessarily evolved over time, in response to changing circumstances such as the interception of certain types of packages and the transfer of Michael between jail facilities. (*Meneses, supra*, 165 Cal.App.4th at pp. 1669-1671; *Gann, supra*, 193

14

Cal.App.4th at pp. 1005-1006.)  The five shipments had many similarities but also many differences, and the jury could reasonably have concluded that independent agreements were formed each time a shipment was designed and executed.  (*Meneses, supra*, at p. 1669.)  There was no substantial evidence in support of a finding there was but a single agreement for a continuing operation.  Accordingly, the court was not required to so instruct.

In any event, jury instructions are not considered in isolation, and their adequacy is determined by consideration of the entire charge to the jury.  (*People v. Holt* (1997) 15 Cal.4th 619, 677.)  The jury instructions as given covered the nature of the required agreement between the codefendants, or other unknown individuals, to commit the crime of giving a controlled substance to a person in custody.  The jury was told to decide each charge separately, and it filled out five separate verdict forms on the conspiracy charges.  The instructions adequately presented the issue of how many conspiracies were represented in the evidence, without any need for an additional sua sponte instruction.

Because of these conclusions, we need not enter into the debate on the necessity of sua sponte instructions about the number of conspiracies demonstrated, either in the abstract or on this record.  (E.g., *Meneses, supra*, 165 Cal.App.4th at p. 1668.)  It is unnecessary to reach Michael's arguments about the application of harmless error theory or federal constitutional standards for evaluating error, since no instructional error occurred.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

15

*ISSUES ON HEARSAY AND EXPERT TESTIMONY*

Michael contends the trial court misapplied the hearsay exception of Evidence Code section 1223, for statements by coconspirators. He argues the trial court erred when allowing Detective Williamson to testify as an expert about the language used in 15 monitored telephone calls to Cristina by Michael and others, to present his interpretation of certain words as codes used to refer to drug smuggling operations, or of pauses in conversations as indicating expressions for hidden meanings were being used. (Evid. Code, § 801, subd. (a).)

Michael claims additional errors or denials of due process occurred in the rulings that allowed the jury to hear the entirety of the recordings, which also contained extraneous, irrelevant or inadmissible material that was unduly prejudicial to him and to his credibility. (Evid. Code, § 352; *People v. Partida* (2005) 37 Cal.4th 428, 439.)

A. Applicable Standards: Hearsay Exception

Although hearsay evidence is generally inadmissible under Evidence Code section 1200, a hearsay statement is admissible against a party under Evidence Code section 1223 if: "(a) [t]he statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong *and in furtherance of the objective of that conspiracy*; [¶] (b) [t]he statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) [t]he evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) *or, in the court's discretion as to the order of proof, subject to the admission*

*of such evidence.*" (*Gann, supra*, 193 Cal.App.4th at pp. 1005-1006; italics added; *People v. Hardy* (1992) 2 Cal.4th 86, 139 (*Hardy*).) The acts and declarations constituting a conspiratorial agreement "are admissible as 'part of a transaction' that is in issue and therefore outside the hearsay rule." (1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 135, p. 990.)

The relevant standards for admissibility are set forth in *People v. Herrera* (2000) 83 Cal.App.4th 46, 63: "In order for a declaration to be admissible under the coconspirator exception to the hearsay rule, the proponent must proffer sufficient evidence to allow the trier of fact to determine that the conspiracy exists by a preponderance of the evidence. A prima facie showing of a conspiracy for the purposes of admissibility of a coconspirator's statement under Evidence Code section 1223 simply means that a reasonable jury could find it more likely than not that the conspiracy existed at the time the statement was made." (See 1 Witkin, Cal. Evidence*, supra*, Hearsay, § 134, p. 989.)

Assuming such prima facie evidence of a conspiracy is presented, the trial court may admit evidence under Evidence Code section 1223 to show, circumstantially, that such an agreement "may be inferred from the conduct of the defendants mutually carrying out a common purpose in violation of a penal statute." (*Gann, supra*, 193 Cal.App.4th at pp. 1005-1006.) For these purposes, " '[W]hether statements made are in furtherance of a conspiracy depends on an analysis of the totality of the facts and circumstances in the case.' " (*Ibid.*, citing *Hardy, supra*, 2 Cal.4th at p. 146.)

17

B. Procedural Background on Expert's Qualifications; Analysis

In this case, the jail calls included a number of specialized terms and references that were arguably so beyond the common experience that the opinion of an expert was needed to assist the jurors, as triers of fact. (*People v. Xue Vang* (2011) 52 Cal.4th 1038, 1044; Evid. Code, § 801, subd. (a).) The prosecution presented Detective Williamson as an expert who was familiar with jail security issues and gang communications, and who could interpret the terminology appearing in the calls. Michael contends the trial court abused its discretion in allowing such testimony. Determining expert qualifications is discretionary with the trial court, and the court's rulings on the matter are reversible where a showing of a clear abuse of discretion can be made. (*People v. Jones* (2012) 54 Cal.4th 1, 57; *People v. Kelly* (1976) 17 Ca1.3d 24, 38.)

When the prosecutor sought to play about two hours of such recordings for the jury, as communications made in furtherance of a conspiracy to furnish drugs, defense counsel twice asked for a hearing under Evidence Code section 402 on Detective Williamson's qualifications and the bases for his opinions about gangs in jail. The court indicated the prosecutor would need to lay a proper foundation to qualify Detective Williamson as an expert. (Evid. Code, § 801, subd. (a).)

A defense motion in limine to exclude the jail calls and phone identifications as unreliable was denied without prejudice. The court anticipated that Michael's attorney could attack the reliability of the expert's opinion as to its weight as evidence. In response to defense counsel's objection that the jail calls were hearsay and not reliable, the trial court explained that since they were being alleged to be "statements in

18

furtherance of a conspiracy," they would come in under a clearly recognized hearsay exception (i.e., Evid. Code, § 1223). Also, since different PIN numbers were used in the calls, the court stated that evidence was relevant as showing there were various co-conspirators who made further attempts to deceive or mislead.

Once the testimony began, Cristina's attorney made a standing objection, joined by Michael, for improper opinion and lack of foundation. It was overruled. Defense counsel made another objection that Detective Williamson's opinions on why there were some pauses in the recordings were unduly speculative, but it was also overruled.

In explaining his qualifications, Detective Williamson testified he began working in county jails immediately after his 2004 graduation from the police academy, and he initially received 24 hours of training each year, on gang and narcotics issues. His on-the-job training included monitoring incarcerated gang members in cooperation with the Oceanside Police Department, and working as a "handler" for an informant. In 2009, he started work as an area investigator to follow up on crimes committed in jail. In 2010, he was assigned to the Detentions Gang Unit, and obtained "over 300 hours of gang- and narcotics-related training." This was the first time he had testified on these subjects as an expert.

Detective Williamson's current assignment at the jail required him to monitor and document gang members who were in custody, by conducting investigations, executing search warrants, and searching inmates suspected of drug smuggling. He worked with gang members on a daily basis. He found in his work that inmates tend to communicate in code when they are talking about something illegal. By listening to jail phone calls and other

19

communications, he could now recognize patterns "for what to expect, what we're going to be getting and how to catch it." He stated, "the more odd the conversation sounds, the less it makes any sense to anyone, it seems the more likelihood that something illegal's going on."

Williamson explained he had listened to several CD recordings of Michael's and Cristina's voices, and could identify them in many of the calls using different PIN numbers over several months. He also heard many unidentified male voices on the recordings who were communicating with Michael and Cristina on topics that seemed to include the use of such expressions for arranging transactions. When there were pauses in the conversations, they likely indicated that a participant was taking time to recall an arranged code word for something illegal. In many such phone calls, the voices switched back and forth between ordinary conversational rhythms and more interrupted types of expression. This indicated that callers seemed to be using a prearranged set of code words about drugs and methods for smuggling them.

The defense continued to claim that the factual questions about the meaning of the calls should be left to the jury, but the court explained that Williamson's expertise was of the type gained on the job, and the jury would be allowed to give his expert testimony the weight it deserved pursuant to the CALCRIM instructions to be given on that topic (e.g., Nos. 332, 360). To improve the jury's understanding, the written transcripts of 15 jail calls were made available to the jury as court's exhibits, but were not admitted into evidence.

Based on Detective Williamson's experience in dealing with coded language over his eight years on the job, the court ruled that he was qualified to testify about gang

interactions in custody, including drug smuggling, even if he were assumed to be filtering the information "through his biases, if you will, as an investigating officer."  The court noted defense counsel could cross-examine the witness about his experience level, and could argue "other reasonable interpretations" to the jury.  The trial court could reasonably determine that the jury would benefit from hearing this expert testimony on the meaning of some of the words and arrangements discussed in the jail calls.  The court had an adequate basis to decide that Williamson had developed the necessary expertise to present the opinions he had formed on the meaning of some of the terms used in them, and there was no abuse of discretion in this respect.

### C.  Substantive Arguments on Expert Testimony

Even assuming arguendo that coded communications by jail inmates are proper subjects of expert testimony, Michael claims the conclusions drawn by Detective Williamson lacked evidentiary support in several ways.  First, Williamson had chosen only some of the Michael-Cristina telephone calls to listen to, dated from around the times that packages were intercepted, because there were so many calls (four to five times a day, 45 minutes per call). Michael argues this selectivity unfairly targeted statements that could be "interpreted" as "coded language" references to drugs.

On the record provided, it was not an unreasonable investigative tactic for Detective Williamson to decide that he would only listen to some of the Michael-Cristina telephone calls that occurred around the same times that packages were intercepted, over eight months, since he would not have time to do anything else if he listened to all of

them. Michael has not shown that this was an unreasonable sampling method, and the jury could weigh the evidence in that context.

The recorded jail calls fell into three groups, first from August 2010, then November 2010, then numerous calls from April 2011. Michael claims the interpretations placed on certain language used in the recorded phone calls were incorrect, and alternative interpretations are possible or likely. For example, in the August 2010 call, Michael told Cristina to send all the album covers or music to "Lil' Bro" and make sure they were wrapped right. She said she had received an e-mail confirmation the shipment was made. Although Williams thought that they were talking about a drug shipment, not music, Michael and Cristina did have a music business and Michael did have a brother. Not all references to music or CDs in the recordings were interpreted by Williamson as having to do with drugs.

Two days after the August 2010 call, a "legal mail" package addressed to another inmate and containing heroin was intercepted, and it had Cristina's fingerprint on it. That handwriting was similar to a letter she sent to Michael around the same time.

In the November 2010 calls, Michael had recently been moved to the Vista facility. On one of the calls, a man told Cristina that he got "them pictures and shit," apparently from a previous mailing. When Michael told Cristina at that time that he did not want to ask other inmates for anything, he could have been talking about necessary food and supplies, as opposed to using the telephone PIN numbers or names of other inmates to arrange drug package deliveries.

22

Likewise, when Michael asked that Cristina look for a 24-hour postal place, and she said she hadn't heard of them, Michael explained "I know in the state they be hav[ing] them." He and Cristina talked about "having Ray get at me," or using the 24-hour postal place for Ray. Although Williams interpreted that reference to a postal place as meaning there might be a compromised jail staff member who was receiving drug packages (since an item sent in November 2010 did not have canceled postage on it), Michael argues there could have been another explanation.

By the time of the nine April 2011 calls, Michael was back at the George Bailey facility. Some of the calls were from unidentified voices and used PINS from other inmates, and Cristina set up several of the calls as three-way calls. Williamson gave the opinion that gang members on the outside were using three-way calls to avoid violating their parole conditions that prohibited contact with fellow gang members. Many topics were discussed involving money, Judy and Ray, and taking care of people on the outside. Due to Michael's wealth, he was able to help other gang members and Cristina assisted him in doing so. Williamson gave the opinion that Michael was acting like a Robin Hood who was creating loyalty to his cause.

Michael and Cristina also talked about "duck things," apparently the photo mailers that were sometimes used to send drugs. Since several books had been recently intercepted, Williamson believed that the smuggling plans were being changed again.

Michael admitted on cross-examination that all his calls to Cristina were in code, to protect them from police interference in concerts or rap events. When he and Cristina and their messengers used the terms Judy and Ray, they were referring to contact persons from

23

the Mexican Mafia that Cristina was required to contact, to provide drugs to protect Michael. Thus, Michael argues that Judy and Ray were real people participating in the duress being exerted on him, and not necessarily voluntary smuggling references. At one point, Cristina said she "spoke" to Rudy at 2:00, so Michael argues Rudy must have been a person and not a means of messaging about sending drugs at a certain time.

When an unidentified male called Cristina on April 5, 2011, because Michael was in the hole and needed a messenger, the man told her, "he like Judy and Ray, and then that he'll call you ASAP, maybe like two, three in the morning." Williamson explained the message as saying, "whatever didn't work out, get it fixed and get it done." In another call, the male told Cristina that Michael wanted to know what was up with Judy and Ray, and Cristina said she talked to them.

In a long call, Michael told Cristina that Judy "didn't make it through there." Michael then told Cristina to "tell him not to hit" him again. On cross-examination, he explained that police agents or enemy inmates had been setting him up for exposure, so the drug plans were not feasible. Williamson said that recording could be interpreted as meaning the shipping scheme was being discontinued.

Michael offers another interpretation of the questioned "smuggling" terms, with respect to a taped argument Michael and Cristina had about her use of the name "Tish" in an e-mail. Michael said to Cristina she should have used the "joke name," and asked, "now why would you write that girl, uh, Judy — uh, uh, Rudy's name, uh, uh, Tish. [unin] [¶] That's too much information." Williamson testified that this communication supported his conclusion that Judy, Rudy and Ray were made up code names for drugs. Michael says the evidence

24

does not support those conclusions, because the woman Tish could have been also referred to as Judy or Rudy, so that Williamson was wrong when he concluded that Judy was a reference to drugs, not a person.

All of this testimony presented different suggested meanings of the terms Judy and Ray or Rudy Huxtable, and it was up to the jury to evaluate the expert testimony interpreting the jail phone calls for the purpose of giving it the weight it deserved. The court provided as court exhibits the written transcripts of the jail calls, for accuracy of listening. The meaning of the terminology and names used in the calls was not immediately obvious, and the ongoing discussions about sending music and photos, finding postal places and taking care of errands and people formed a pattern that could be interpreted through the use of expert testimony, because it was outside the realm of everyday experience for people unfamiliar with incarcerated gang members. Detective Williamson was properly allowed to offer interpretations for the jury to consider. The jury was told that it need not accept expert opinion as true and correct, and that it "may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

Even though Michael offers alternative explanations for the expressions used in the recorded calls, both in his testimony and in the briefs on appeal, he cannot show that there was no foundation in the recordings for the conclusions that Williamson drew. The trial court did not err in allowing this expert testimony to be presented to enable the jury to have the tools for determining whether the statements made were in furtherance of the charged conspiracies, based on an " 'analysis of the totality of the facts and circumstances

25

in the case.' " (*Gann, supra*, 193 Cal.App.4th at pp. 1005-1006.) The trial court acted in compliance with the Evidence Code and within its discretion in ruling on the evidence offered.

### D. Arguments on Prejudicial v. Probative Value

Based upon his views of the evidence, Michael argues that the trial court was unjustified in allowing the full two hours of recordings to be played for the jury. Many topics were discussed, including Michael's health, legitimate music business matters, and Cristina's problems. Michael claims that even if some of the statements in them were admissible as statements of coconspirators in furtherance of a conspiracy, other statements were inadmissible or unduly prejudicial. Specifically, the extraneous material in the recordings included profanity, racial and gender slurs, and gang references, and cumulatively, Michael argues the prejudicial value of the tapes and transcripts outweighed their probative value. (Evid. Code, § 352.) Since he had admitted to smuggling drugs, but only under duress by members of the Mexican Mafia, he argues he was entitled to have the jury evaluate his credibility without so much prejudicial taped jail call evidence.

When the prosecutor indicated the entirety of the jail calls would be played (except for one 45-minute one), defense counsel raised numerous grounds of objection, which the trial court deemed to be continuing objections on admissibility of the calls and the gang expert's analysis of them. When Michael agreed that one very long call need not be played in its entirety, that did not operate to waive the previous objections. We find no indication that Michael has somehow forfeited objections to admission of all or portions of the recorded calls.

26

On the merits, even where portions of a witness's taped statements are properly admitted, the entirety of the recording is not necessarily admissible as well. (*People v. Riccardi* (2012) 54 Cal.4th 758, 803-804.) The inquiry should be whether the playing of an entire recording would properly correct any misimpression created by playing only portions of it. (*Ibid.*)

Normally, error in admitting evidence is subject to the reasonable probability test, asking whether the verdict would have been more favorable to the defendant absent the error. (*People v. Earp* (1999) 20 Cal.4th 826, 878.) If a trial court has erred by admitting excessive or extraneous recorded materials, such error may be deemed harmless, if it is not reasonably probable on the record that a different result would have been reached absent the error. The reviewing court examines the question in light of the effect of other admissible evidence or reasonable inferences therefrom. (*People v. Partida, supra*, 37 Cal.4th at p. 439.)

However, where the admission of evidence was erroneous under state law and further operated to make a trial fundamentally unfair, due process violations may have occurred, and Michael argues that this trial was unfair. (*People v. Partida, supra*, 37 Cal.4th at p. 439.)

The trial court allowed the playing of most calls in their entirety, to give context to the portions being focused on by the prosecution. This was in compliance with Evidence Code section 356, to permit the jury to evaluate a code word or expression being identified, within the context of the entire recording, as "necessary to make it understood." (Evid. Code, § 356.) It was appropriate to use the various calls to give context and meaning to the individual

terms used in them, but there were still uncertainties about the exact subjects of the discussions. There were pauses around the use of some of the terms, which led Detective Williamson to believe that those pieces of conversation were discussing illicit activities and using coded language. Other conversations that flowed more normally sounded more like ordinary speech.

Together with the physical evidence of the shipments, as prima facie evidence of a conspiracy, the jail calls qualified as admissible circumstantial evidence that Michael and his associates were engaged in conduct that was "mutually carrying out a common purpose in violation of a penal statute." (Evid. Code, § 1223; *Gann, supra*, 193 Cal.App.4th at pp. 1005-1006.) The probative effect of the recordings was properly found to outweigh their prejudicial effect. When Michael testified, he had several outbursts of temper during cross examination that caused the court to strike his direct testimony, although the court reversed that order when Michael submitted to cross examination the next day. The jury had a fair opportunity to evaluate Michael's voice and demeanor in the recordings and also in his testimony. The trial court did not abuse its discretion in allowing the recordings to be played as a whole.

Due to the lack of evidentiary error, we need not reach Michael's arguments about the application of harmless error theory or federal constitutional standards for evaluating alleged error. (*Watson, supra*, 46 Cal.2d at p. 836; *Chapman v. California, supra*, 386 U.S. at p. 24.)

28

## III

### *CONSPIRACY ISSUES:  SUFFICIENCY OF THE EVIDENCE*

Michael next contends the evidence only supported a conclusion that he and Cristina reached only a single agreement to make continuing shipments of drugs into jail, so that as a matter of law, four of his conspiracy convictions must be reversed for insufficient evidence. (See, e.g., *Meneses, supra*, 165 Cal.App.4th at pp. 1669-1671.)

### A.  Applicable Standards

Basic definitions of the offense of conspiracy, under section 182, subdivision (a) require " 'proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, *as well as the specific intent to commit the elements of that offense*, together with proof of the commission of an overt act . . . .'  [Citations.] Conspirators must agree to the commission of a criminal act.  They also have to possess certain kinds of knowledge and criminal intent.  In other words, they agree to the act while possessing a given mens rea.  It would be imprecise to say that they 'agree' to have a certain knowledge or mental state.  Instead, to satisfy the elements of traditional conspiracy, they agree to an act, and they do so while possessing the required mental state."  (*Johnson, supra*, 57 Cal.4th at pp. 263-264; original italics.)

In evaluating this claim of insufficiency of the evidence to support each of the conspiracy convictions, this court views the evidence in the light most favorable to the prosecution, and we presume, in support of the judgment, the existence of each fact that the jury could reasonably have deduced from the evidence.  (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.)

B.  Testimony and Analysis

Michael cites and applies the factors laid out in *People v. McLead, supra*, 225 Cal.App.3d at p. 920, for considering how many conspiracies were proven.  He would conclude from the evidence that he and Cristina had a singular objective of smuggling drugs into jail, because each of the five packages was shipped pursuant to an existing agreement already in place, and that the coded phone calls operated to carry it out.  He contends the same motives and the same customers (inmates in the jail population) were always involved. (*Meneses, supra*, 165 Cal.App.4th at p. 1672.)

Michael fails to recognize that the jury could reasonably have deduced from the evidence that his many recorded conversations with Cristina and representatives of Michael demonstrated that Michael was creating and adapting separate agreements to accomplish the targeted offenses, according to the changing circumstances.  While Michael was confined at the George Bailey facility, he had local confederates who cooperated with him, and different forms of packaging were used, including legal mail. As those packages were intercepted, other methods were developed, such as use of duck photo mailers and shipments of books, some with pages glued together with heroin.

When Michael was located in Vista, there were not as many phone calls involving other cooperating participants or addressees.  During the overall eight or nine month period that the shipments were going on, different means were used, including different messengers, instructions and methods of packaging.  Some, but not all, of the phone calls suggested there was a jail employee who might be involved ("24 hour postal place").

The record contains sufficient evidence to support jury conclusions that Michael and Cristina reached mutual understandings to accomplish these separate acts, and they evidently were creating more than one unlawful design, using a network of participants, to accomplish the target offenses. (*Johnson, supra*, 57 Cal.4th at pp. 263-264, 266.) There was evidence of different and individualized overt acts committed with and by unidentified third parties, such as other friendly inmates, or the Mexican Mafia representatives who provided the drugs, took money from Cristina for them, and showed her how to package them in several ways. Michael and Cristina anticipated in each instance that the drugs being shipped would be passed on to other participants to provide in jail, as sellers or purchasers. More than a single design was arranged for seeking an unlawful result, in different ways. (*Braverman, supra*, 317 U.S. at p. 53.) Sufficient evidence supports all five of Michael's conspiracy convictions.

IV

*SUPPLEMENTAL BRIEF: INVESTIGATION INTO POTENTIAL JUROR MISCONDUCT*

A. Background

Similar to what Cristina's appeal previously argued, Michael's contention is that the trial court failed to carry out an adequate investigation of potential juror misconduct. During the cross-examination of a prosecution witness, Detective Cahill, an incident occurred in which he apparently smiled and/or winked at several jury members, and some laughter followed. Shortly thereafter, while out of the presence of the jury, counsel for Michael told the court, "Apparently while we came out for sidebar last time, Mr. Cahill winked at Juror Nos. 1, 2, and 13 and they started laughing together. That just needs to go on the record. I

31

didn't see it but according to both defendants—I haven't talked to court staff yet but apparently he's making inappropriate faces to the jury while we're out of their presence."

The court responded, "He certainly shouldn't do that." The prosecutor spoke up, "I question the source of that information, your Honor." The court replied, "Yeah. All right. Well, he certainly should be cautioned not to do that."

Cristina's attorney expressed concerns about such possible communication between Detective Cahill and the jury, and requested that the court admonish the witness or the jury. After further inquiry by Michael's attorney on what had actually happened, the court asked what form any such admonishment should take. Cristina's attorney requested "that there should be no communication between this witness and the jury outside the presence of the Court and counsel. If it occurred." Detective Cahill spoke up, "It never occurred." The court replied to counsel, "I think he understands as a professional law enforcement officer that this is totally impermissible. So consider him admonished."

Michael's attorney requested that the judge poll the three involved jurors, on the basis that in the courtroom, Michael and Cristina each saw Cahill laughing with several jurors and winking at one, at a time when counsel was going out for a conference in the back hall. After further proceedings, both defense attorneys moved for a mistrial on that ground. The court denied the motions, stating, "I don't think there's any credible evidence to, ah, support that motion so that motion is denied."

### B. Applicable Standards

" ' "When a trial court is aware of possible juror misconduct, the court 'must "make whatever inquiry is reasonably necessary" ' to resolve the matter." [Citation.] Although

32

courts should promptly investigate allegations of juror misconduct "to nip the problem in the bud" [citation], they have considerable discretion in determining how to conduct the investigation.' [Citation.] ' . . . The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial.' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1284 (*Virgil*)*; People v. Ray* (1996) 13 Cal.4th 313, 343 (*Ray*).)  The courts will not reach issues of prejudice unless jury misconduct is found.  (*People v. Collins* (2010) 49 Cal.4th 175, 242.)

On appeal, we examine the trial court's rulings on the issue for any abuse of discretion.  (*Virgil, supra*, 51 Cal.4th at p. 1284.)  In this context, the courts assess likely prejudice under this standard by determining whether, objectively viewed, the matter was "inherently likely to have influenced the juror."  (*People v. Marshall* (1990) 50 Cal.3d 907, 951.)  We ask whether the record shows a substantial likelihood that at least one juror was influenced by exposure to extrinsic matter that directly related to the issues at trial.  (*Ibid*.)  "[A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case."  (*Ray, supra*, 13 Cal.4th at p. 343.)

If a jury is inadvertently given and considers extraneous evidence, the incident is not considered to be jury misconduct.  (See, e.g., *People v. Cooper* (1991) 53 Cal.3d 771, 836 [a transcript not in evidence was mistakenly sent to the jury room].)  In such a case no presumption of prejudice arises.  "Such error is reversible only if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error."  (*Ibid.*)

33

In *People v. Ryner* (1985) 164 Cal.App.3d 1075 (*Ryner*), the appellate court found the trial court erred in concluding no misconduct had occurred, when a testifying officer had engaged in conversation with several jurors during a break outside the courtroom. (*Id.* at p. 1080.) Even though no discussion of the merits of the case took place, the conversation was deemed to be impermissible, because it might well have caused the jury to accord the officer's testimony more credibility than otherwise appropriate. (*Id.* at p. 1082.) "By engaging Officer Boyd in an amiable discussion of police work and other topics of mutual interest, we conclude that the jury members did a disservice to appellant's right to a fair and impartial tribunal." (*Ibid.*) However, neither the misconduct nor the trial court's mistake required reversal, because the incident was relatively trivial and the officer was not a key witness. (*Id.* at p. 1083.)

Although Michael seeks to have us apply a de novo standard of review for mixed questions of law and fact, regarding the adequacy of this investigation, it would not be appropriate to do so. (See *People v. Cromer* (2001) 24 Cal.4th 889, 900 [the first inquiry is a matter of determining the historical facts, and deferring to the trial court's factual findings; the second "requires application of an objective, constitutionally based legal test to the historical facts"].) He has not given any reasoned argument for why the usual abuse of discretion test should not apply here. (*Virgil, supra*, 51 Cal.4th 1210, 1284.)

## C. Jury Instructions; Investigation

The court explained to the jury panel during voir dire that the only evidence to be considered would be "the testimony of witnesses under oath and some exhibits which may be received." When testimony began and when the case was submitted to them, the

34

jurors received more instructions about their duty to decide the case based on the evidence presented, and not on matters of "empathy, sympathy, bias, prejudice, public opinion, public feeling." (CALCRIM Nos. 200, 222, 223, 302.)

Numerous sidebar conferences had been called throughout trial to discuss evidentiary objections. After the initial discussion about Detective Cahill's behavior in front of the jury, the prosecutor updated the court as follows: "Your Honor, if I may. I've got a lot going on. I neglected to inform the Court, um, that during this whole alleged incident, um, defendant [Michael] was mouthing to Cahill something to the effect, 'Motherfucker, got you.' Like got you in a lie or something like that. Ah, Investigator Cahill looked away and looked at this, ah, investigating officer, Williamson. Um, and they were, ah—had some communication with each other. This was all witnessed by Deputy District Attorney Lisa Moffatt, who was present in the courtroom. Ah, that was—I was informed of that over the lunch hour by Miss Moffatt." At that point, the court did not deem it necessary to investigate further.

When Michael's attorney renewed the mistrial motion, the court ruled that "it's been decided," and "[t]here's no credible evidence that that occurred." Also, the court denied a second request to poll the jurors on the issue. Later, Michael testified about how he hated the police and he was offended when one of them laughed and winked at some jurors during his trial.

### D. Contentions and Analysis

Michael contends the trial court did not conduct an adequate investigation into the possible effects upon the jurors of Detective Cahill's conduct, and that reversal is

35

required. He claims that the trial court had been alerted to affirmative evidence that might show there was good cause to remove a juror. (*People v. McNeal* (1979) 90 Cal.App.3d 830, 840.)

Initially, the court heard argument from both defense counsel about their clients' observations about the interaction, while Detective Cahill was present, and then it effectively admonished him by reminding him of proper courtroom conduct. The court also heard another explanation for what happened, when the prosecutor reported that his colleague had seen Michael initiating communication with Detective Cahill, possibly causing a visible response or reaction.

After hearing from all parties about the interchanges during Detective Cahill's testimony, the court determined there was no "credible evidence" that misconduct occurred, and denied the motion for a mistrial. The court reconsidered the matter at Michael's attorney's request, and found that under all the circumstances, it was unnecessary to poll the jury.

"Not every incident of potential misconduct requires further investigation." (*Virgil, supra*, 51 Ca1.4th at p. 1284.) The trial court had a reasonable basis to conclude that these interactions were fleeting, and the concerns raised by defense counsel were speculative in nature. On this record, the court acted appropriately in concluding that an informal method of resolving the matter was sufficient, by asking for explanations, informally admonishing the witness, and making a discretionary decision to move on with the case. (*Ibid.*; *People v. Hayes* (1999) 21 Ca1.4th 1211, 1255.)

36

The court would also have been justified in concluding that even if the detective's reported conduct did occur, such relatively innocuous activity would most probably not have adversely affected the jurors' impartiality in performing their duties, in light of the instructions given to them. (See *People v. Avila* (2006) 38 Cal.4th. 491, 604; *Ryner, supra*, 164 Cal.App.3d at p. 1083.) The jurors received instructions not to discuss the case and not to consider matters outside of the evidence. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852; *People v. Holt* (1997) 15 Cal.4th 619, 662 [jurors are presumed to follow the court's instructions].)

The record shows that numerous sidebar conferences had been going on from the outset of the case, and the court had repeatedly urged counsel to respect the jury's time and move on with the arguments. We do not speculate why this detective apparently winked at jury members or why laughter ensued, whether because of lengthy delays during trial or friction with a defendant about testimony being given. The trial court's resolution of the investigation matter was not an abuse of discretion, particularly in light of the extensive evidence on the merits of the charges as presented by other witnesses. Michael acknowledges that there is substantial evidence to show he conspired with Cristina to have drugs sent into the prison, but contends that because of his own extensive financial assets, he did so as a result of the duress exerted by other inmates. He was given the opportunity to present this theory, but the jury did not accept it. The record does not support a conclusion that these circumstances led to a potential pro-prosecution bias on the part of any jurors. (See *People v. Seaton* (2001) 26 Cal.4th 598, 676.) Under all the circumstances shown, the court could reasonably decide that the procedural

37

problem presented did not warrant further investigation or delay.  (*Virgil, supra*, 51 Cal.4th at p. 1284; *Ray*, *supra*, 13 Cal.4th at p. 343.)  It was not error to deny the defense motion for mistrial.

DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

McDONALD, J.

McINTYRE, J.