Filed 3/25/21  P. v. Calderon CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>           v.<br><br>JUAN CALDERON,<br><br>      Defendant and Appellant. | F077272<br><br>(Super. Ct. No. F14910981)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  James M. Petrucelli, Judge.

Jin H. Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Juan Calderon was charged with four counts of second degree robbery (Pen. Code,[1] § 211 [counts 1, 3, 5, & 7]) and four counts of impersonating a public officer (§ 146a, subd. (b) [counts 2, 4, 6, & 8]). Following trial, the jury found him guilty as charged on all counts. Defendant was sentenced to an aggregate term of five years: two years on count 1; a concurrent two years on count 2; a consecutive one year on count 3; a concurrent two years on count 4; a consecutive one year on count 5; a concurrent two years on count 6; a consecutive one year on count 7; and a concurrent two years on count 8. He was ordered to pay a $1,500 restitution fine (§ 1202.4, subd. (b)), a $320 court operations assessment (§ 1465.8), and a $240 court facilities assessment (Gov. Code, § 70373). A $1,500 parole revocation fine (§ 1202.45) was imposed and suspended.

On appeal, defendant makes several contentions. First, the convictions for second degree robbery in counts 1 and 7 and impersonating a public officer in counts 2 and 8 must be reversed because the trial court erroneously admitted into evidence testimonial statements made during 911 calls. Next, the concurrent sentences imposed in counts 2, 4, 6, and 8 must be stayed pursuant to section 654. Finally, the case must be remanded so the court can conduct an ability-to-pay hearing pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).

We conclude the sentences imposed on counts 2, 4, 6, and 8 must be stayed pursuant to section 654. In all other respects, we affirm the judgment.

**STATEMENT OF FACTS**

### I. Patrick King

In connection with this case, King (who is not party to this appeal) was charged with four counts of second degree robbery. Pursuant to a plea agreement, he pled guilty

---

[1]     Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

to a single count.  King was not required to testify under this agreement.  He was served with a subpoena to appear at defendant's trial.

Beginning at the end of 2013, defendant and King worked in "private security" and in "bounty hunting."  (Boldface omitted.)  In these capacities, each would carry a flashlight and wear a uniform consisting of a black shirt, black tactical vest, and black tactical pants.  The front of the vest displayed a small patch with the word "Agent" in white.  The back of the vest displayed a bigger patch with the word "Agent" in white.  King used his personal vehicle—a gray 2012 Chrysler 200—on the job.

In October 2014, defendant and King developed a scheme to dress in their uniforms "[t]o look like authority figures," "go out and find people that either looked like they had money, looked like they were drunk, not coherent, and stop them, frisk them, get their wallet, take their money and then send them on their way."  At trial, King remarked: "[I]f a cop tells you that they need to search you, you would comply."  The pair utilized the ploy to commit over 10 robberies between October and November 2014.

## II.     Robbery of Abner C. (counts 1 & 2)

Abner did not testify at trial.  Instead, the prosecution played an audio recording of his 911 call received on November 23, 2014, at 7:01 a.m.  Abner informed the dispatcher that a "[B]lack guy" and a Hispanic male "stopp[ed] him for drunk driving," "pulled him out," "took his wallet and started going through the wallet looking for drugs," and "took off."  Thereafter, he noticed $700 was missing.  The incident transpired the previous night "at 11:00 or 12:00" in a parking lot near a bank.  Abner pointed out each man appeared "sort of like a cop, like very – very much undercover, with bulletproof vests and everything."

King testified that on the night of November 22, 2014, he and defendant were in the Chrysler 200 in a parking lot near a bank when they spotted a man in a car who appeared inebriated.  The pair, who were dressed in their uniforms, exited the Chrysler and approached the man.  King asked the man "if he had been drinking."  When the man

3.

responded in the affirmative, King "told him to step out," asked for identification, "told him [defendant] would be searching him," and had him "turn and face [his] car" "with his hands behind his back." Defendant searched the man, found a wallet in a back pocket, and checked for money. King could not recall seeing defendant taking anything out of the wallet. After returning the wallet but before leaving the scene, King instructed the man "to sit in the car and sleep it off."

### III. Robbery of Robert S. (counts 3 & 4)

Robert S. testified that on November 23, 2014, at around 1:00 a.m. or 2:00 a.m., he and two coworkers were in the process of repossessing a vehicle when a "newish" gray Chrysler car "pulled up with the red and blue lights on." The driver was a Black male and the passenger was a Hispanic male. Both were wearing black clothing and tactical vests. The men identified themselves as members of the "gang task force" and ordered Robert S. and his colleagues to "put [their] hands up." The trio complied because they "thought [the men] were officers" based on their "[c]lothing and the blue and red lights." The supposed officers had Robert S. and his coworkers "turn around" and "started patting [them] down." The Black male took Robert S.'s wallet and "started going through it behind [his] back." The Hispanic male did the same to the others. The wallets were eventually returned, and the Black male told the three to "just get out of here." The Black male and Hispanic male then "got in their car and took off fast." Afterwards, Robert S. checked his wallet and noticed $100 was missing. He reported the incident to law enforcement. Robert S. was shown two photographic lineups. He identified King and defendant as the Black male and Hispanic male, respectively. At trial, Robert reidentified defendant as one of the perpetrators.

### IV. Robbery of Robert G. (counts 5 & 6)

Robert G. did not testify at trial. Instead, the prosecution played an audio recording of his 911 call received on November 23, 2014, at 6:38 p.m. Robert G. told the dispatcher he "was pulled over" "Saturday morning, about 1-ish in the morning" by two

men in a "gray sedan" wearing "sheriff's vests." They "asked for [his] ID," "grabbed [his] wallet from [him]," "handed it back," and "let [him] go on [his] way." Thereafter, "there was $300.00 in [the] wallet that's missing."

In addition, Robert G.'s preliminary hearing testimony was admitted into evidence. At this hearing, he testified that on November 22, 2014, at around 1:00 a.m., he was driving home in his red pickup truck when he noticed flashing lights in the rearview mirror. Robert G. pulled over and a "gray silver sedan" stopped beside him. The sedan's passenger, a "[t]all [B]lack man," pointed a flashlight at his face and accused him of drunk driving. Robert G. denied the allegation. He asked the passenger if he and the driver, both of whom were wearing what appeared to be bulletproof vests, were undercover officers. The passenger said, "[Y]eah, we undercovers." Robert G. exited his truck and raised his hands. The passenger approached him, instructed him to "face away from him," and asked for identification. After Robert G. took out his wallet, the passenger "snatche[d]" it away. The wallet was returned at least 30 seconds later. The passenger told Robert G. he "can't drive" and instructed him to "lock up [his] car" and "walk from here." The supposed officers then "sped off." Robert G. subsequently realized $300 was missing from his wallet. At the hearing, he identified defendant as the driver.

King testified that on November 22, 2014, he and defendant were driving in the Chrysler 200 when they found a red pickup truck and stopped alongside it. Both were dressed in their uniforms. King turned on his flashlight and saw a man inside. He asked him if he had been drinking. When the man responded in the affirmative, King "pulled him out" of the truck and then had him "put his hands behind his back" and "spread his legs." Defendant conducted a search, "grabbed the wallet," and "pulled some cash out." King then told the man to "take the keys out of the ignition," "lock up his truck," and "walk home."

5.

## V.      Robbery of Fidel H. (counts 7 & 8)

Fidel did not testify at trial.  Instead, the prosecution played an audio recording of his 911 call received on November 24, 2014, at 1:29 a.m.  Fidel told the dispatcher he was near a nightclub earlier when two men wearing vests approached him, identified themselves as police officers, and accused him of urinating in public.  They "grabbed [him]," asked for identification, "checked [his] wallet," and "took out" over $1,000.  The pair then left in a gray Chrysler car.

King testified that on November 24, 2014, around midnight, he and defendant were in the Chrysler 200 in a parking lot near a nightclub when they "observed a man urinating on the wall."  The pair, who were dressed in their uniforms, exited the Chrysler and approached him.  King asked the man "if he was urinating on the wall."  After the man admitted it, King asked for his identification, "told him that [defendant] was going to search him," and had him face a wall.  Defendant searched the man, found a wallet in a back pocket, and removed a "stack of cash" totaling over $1,000.  The pair then "left in a hurry."

## DISCUSSION

## I.      Abner's and Fidel's 911 calls

a.  *Background*

The prosecution moved in limine to admit into evidence statements made during Abner's and Fidel's 911 calls.  Defense counsel countered that such statements (1) constituted inadmissible hearsay; and (2) were testimonial, violating defendant's Sixth Amendment right to cross-examine the declarants.  Following a hearing, the court granted the motion.

b.  *Analysis*

On appeal, defendant contends his convictions for second degree robbery on count 1 and impersonating a public officer on count 2 must be reversed because "the statements in [Abner]'s 911 call were testimonial hearsay, which were admitted in

6.

violation of [his] state and federal rights to confrontation." (Boldface omitted.) He likewise contends his convictions for second degree robbery on count 7 and impersonating a public officer on count 8 must be reversed because "the statements in [Fidel]'s 911 call were testimonial hearsay, which were admitted in violation of [his] state and federal rights to confrontation." (Boldface omitted.)

In his opening brief, defendant claims the statements in Abner's 911 call were subject to the hearsay rule "because they were admitted for the truth of the matters asserted, namely, that [Abner] was robbed and the circumstances of the robbery." (See Evid. Code, § 1200.) He did not make any such claim with respect to the statements in Fidel's 911 call. In the respondent's brief, the Attorney General argues the statements in both 911 calls were admissible under the spontaneous statement exception to the hearsay rule. (See Evid. Code, § 1240.) In his briefing, defendant apparently concedes the point. The remaining question is whether the admission of the statements violated the Sixth Amendment's confrontation clause.

"[T]he Sixth Amendment's confrontation clause prohibits the 'admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 803 (*Blacksher*), quoting *Crawford v. Washington* (2004) 541 U.S. 36, 53-54.) "Although the high court has not agreed on a definition of 'testimonial,' testimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*People v. Dungo* (2012) 55 Cal.4th 608, 619; see *People v. Sanchez* (2016) 63 Cal.4th 665, 689, fn. omitted ["Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other

7.

purpose unrelated to preserving facts for later use at trial."].) "On appeal, we independently review whether a statement was testimonial so as to implicate the constitutional right of confrontation." (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.) "We evaluate the primary purpose for which the statement was given and taken under an objective standard, 'considering all the circumstances that might reasonably bear on the intent of the participants in the conversation.' [Citation.]" (*Ibid*.)

The statements made during Abner's and Fidel's 911 calls were not testimonial. "[A] 911 call made during the course of an emergency situation is ordinarily made for the primary nontestimonial purpose of alerting the police about the situation and to provide information germane to dealing with the emergency." (*People v. Gann* (2011) 193 Cal.App.4th 994, 1008.) "Whether an ongoing emergency exists is a 'highly context-dependent inquiry.' " (*Blacksher*, *supra*, 52 Cal.4th at p. 814, quoting *Michigan v. Bryant* (2011) 562 U.S. 344, 363.) For instance, "[e]ven when a threat to an initial victim is over, a threat to first responders and the public may still exist." (*Blacksher*, *supra*, at p. 814.) Here, Abner and Fidel phoned 911 to report robberies perpetrated by two men impersonating law enforcement who remained at large. Abner stated the perpetrators—a Black male and a Hispanic male—appeared to be undercover officers because they wore "bulletproof vests." They accused him of drunk driving and conducted a search ostensibly for drugs. Fidel stated the perpetrators wore vests and identified themselves as police officers. They accused him of urinating in public and conducted a search. In both occurrences, the perpetrators took large amounts of cash from the victims' wallets with no resistance. Abner and Fidel provided the approximate date, time, and location of the encounters. Additionally, Fidel described the perpetrators' getaway vehicle as a gray Chrysler car. This type of background information "would be expected of anyone calling the police during an emergency situation" (*People v. Brenn* (2007) 152 Cal.App.4th 166, 177) and "was important in terms of helping the police formulate an appropriate response to the situation" (*ibid*.). Objectively, the primary purpose of Abner's and Fidel's 911

calls was "to determine [the perpetrators'] whereabouts and evaluate the nature and extent of the threat [they] posed" (*Blacksher*, *supra*, at p. 816), "not to create an out-of-court substitute for trial testimony" (*ibid*.). Furthermore, the statements were not made "under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony." (*People v. Cage* (2007) 40 Cal.4th 965, 984, fn. omitted; see *People v. Gann*, *supra*, 193 Cal.App.4th at p. 1009 [information given to 911 operator neither formal nor structured].)

## II. Section 654

### a. *Background*

At the sentencing hearing, the court noted it was "troubled" "that [defendant] took advantage of a position of trust" and "took advantage of vulnerable people of [his] own ethnic background." It remarked, "If I see a police officer, I'm going to do what he says. Doesn't get any worse in my mind, honestly." The court imposed concurrent two-year terms on each of the four counts for impersonating a public officer.

### b. *Analysis*

Defendant contends the court "should have stayed the sentences for impersonation" pursuant to section 654 because he "committed the crimes of impersonating a public officer and robbery as part of an individual course of conduct with the same objective." We agree.

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Moreover, "because [section 654] is intended to ensure that defendant is punished 'commensurate with his culpability' [citation], its protection has been extended to cases in which there are several offenses committed during 'a course of conduct deemed to be indivisible in time.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)

9.

"It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible." (*People v. Harrison*, *supra*, 48 Cal.3d at p. 335.) "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." (*Ibid*.) "If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*Ibid*.)

"The question of whether the acts of which defendant has been convicted constitute an indivisible course of conduct is primarily a factual determination, made by the trial court on the basis of its findings concerning the defendant's intent and objective in committing the acts." (*People v. Lee* (1980) 110 Cal.App.3d 774, 786; accord, *People v. Nichols* (1994) 29 Cal.App.4th 1651, 1657.) "Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312; see *People v. Blake* (1998) 68 Cal.App.4th 509, 512 ["A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence."].) " 'We must "view the evidence in a light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" [Citation.]' [Citation.]" (*People v. Hutchins*, *supra*, at pp. 1312-1313.)

The record—viewed in the light most favorable to respondent—demonstrates defendant and King planned to rob their victims by pretending to be police officers performing lawful patdowns. As part of this ruse, they donned their security and bounty hunting uniforms, used a vehicle that had flashing red and blue lights installed, and acted like members of law enforcement. In this manner, defendant and King successfully

deceived the victims, which allowed them to take cash out of their wallets unimpeded. At trial, King testified, "[I]f a cop tells you that they need to search you, you would comply." Likewise, the court recognized defendant "took advantage of a position of trust" to ensure the victims acquiesced to the patdowns.

The Attorney General cites *People v. Nguyen* (1988) 204 Cal.App.3d 181, which is factually inapposite. In that case, the defendant and an accomplice entered a market armed with guns. While the defendant was rifling through the cash register, the accomplice forced the clerk to a rear bathroom, took money from his pockets, and had him lie face down on the floor. After the defendant shouted a phrase in Vietnamese "used when 'someone was to kill or be killed,' " the accomplice shot the clerk in the back. (*Id.* at p. 185.) The defendant was convicted of attempted murder and robbery, among other things. (*Id.* at pp. 184-185.) On appeal, the defendant argued the trial court violated section 654 by imposing consecutive terms for these offenses. (*Nguyen*, at p. 189.) Division Three of the Fourth District Court of Appeal rejected the contention. It explained:

> "This act constituted an example of gratuitous violence against a helpless and unresisting victim which has traditionally been viewed as not 'incidental' to robbery for purposes of . . . section 654. [Citations.] [¶] The defense nevertheless argues . . . section 654 bars multiple sentences here because the facts suggest the clerk was shot in order to eliminate him as a witness or to facilitate the assailants' escape. Perhaps; but at some point the means to achieve an objective may become so extreme they can no longer be termed 'incidental' and must be considered to express a different and more sinister goal than mere successful commission of the original crime." (*People v. Nguyen*, *supra*, 204 Cal.App.3d at pp. 190-191.)

In the instant case, officer impersonation—as intended—enabled defendant and King to rob the victims with no resistance. Unlike the defendant and his accomplice in *Nguyen*, they did not commit gratuitous acts of violence after taking the victims' money.

The punishment on counts 2, 4, 6, and 8 must be stayed pursuant to section 654.

11.

## III. Fines and assessments

### a. *Background*

At the sentencing hearing, the court ordered defendant to pay a restitution fine of $1,500 (§ 1202.4, subd. (b)), a court operations assessment of $320 (§ 1465.8), and a court facilities assessment of $240 (Gov. Code, § 70373). A parole revocation fine of $1,500 (§ 1202.45) was imposed and suspended. Defendant did not object to these fines and assessments.

### b. *Analysis*

Defendant contends the court improperly imposed the fines and assessments without determining whether he had the ability to pay them. He relies on *Dueñas*, which was decided after the aforementioned sentencing hearing and while this appeal was pending. In that case, Division Seven of the Second Appellate District held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes any fines or assessments. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164; accord, *People v. Castellano* (2019) 33 Cal.App.5th 485, 488-489.) However, other courts have disagreed. Presently pending before our Supreme Court is *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, in which review is limited to (1) whether a court must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments, and (2) if so, which party bears the burden of proof regarding defendant's inability to pay.

Assuming, arguendo, *Dueñas* applies to this case, we find defendant forfeited any claim as to his alleged inability to pay. The court ordered him to pay a restitution fine of $1,500 under section 1202.4, subdivision (b). When the court imposes a restitution fine greater than the statutory minimum amount of $300, "[s]ection 1202.4 expressly contemplates an objection based on inability to pay." (*People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153; accord, *Aviles*, *supra*, 39 Cal.App.5th at p. 1073.) While

12.

*Dueñas* had not been decided at the time of defendant's sentencing hearing, defendant had the statutory right to object to the $1,500 restitution fine and demonstrate his inability to pay. "Although [section 1465.8] and [Government Code section 70373] mandate the assessments be imposed, nothing in the record of the sentencing hearing indicates that [defendant] was foreclosed from making the same request that the defendant in *Dueñas* made in the face of those same mandatory assessments. [Defendant] plainly could have made a record had his ability to pay actually been an issue. Indeed, [he] was obligated to create a record showing his inability to pay the maximum restitution fine, which would have served to also address his ability to pay the assessments. Given his failure to object to a $[1,500] restitution fine based on inability to pay, [defendant] has not shown a basis to vacate assessments totaling $[560] for inability to pay." (*Frandsen*, *supra*, at p. 1154; accord, *Aviles*, *supra*, at p. 1074.) Hence, we reject the argument that "any objections to the assessments imposed pursuant to . . . section 1465.8 and Government Code section 70373 would have been futile." (*Frandsen*, *supra*, at p. 1154.)

## DISPOSITION

The judgment is modified to provide that execution of punishment on counts 2, 4, 6, and 8 is stayed pursuant to section 654. The trial court is directed to amend the abstract of judgment accordingly and transmit certified copies thereof to the appropriate authorities. In all other respects, the judgment is affirmed.


DETJEN, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


PEÑA, J.

13.